THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellant, *v.* EVELIN PAWLICKE, Defendant-Appellee.

Second District   No. 77-429

Opinion filed August 1, 1978.

J. Michael Fitzsimmons, State's Attorney, of Wheaton (William Linkul and Malcolm F. Smith, Assistant State's Attorneys, of counsel), for the People.

Lewis W. Kreydick, of Barrington, for appellee.

Mr. PRESIDING JUSTICE SEIDENFELD delivered the opinion of the court:

Several inculpatory statements made by defendant while in custody on the day of her arrest on a charge of murder were suppressed. The People appeal from the adverse portions of the suppression order pursuant to Supreme Court Rule 604(a)(1) (Ill. Rev. Stat. 1975, ch. 110A, par. 604(a)(1)). In issue is whether defendant was advised that she had a right to have an attorney present at questioning, whether she was capable of understanding and intelligently waiving her constitutional rights and whether statements made after defendant said she did not want to answer any more questions are admissible.

At about 8:20 a.m. on January 19, 1977, a woman called the Wood Dale police stating that she had just shot a man and gave an address. When an officer appeared at the described residence defendant handed him a revolver. The officer took her into custody and advised her "not to give any information." Defendant responded, "What more can I say? I shot him." Defendant was then taken to the Wood Dale police station where a Bensenville police officer came, told defendant she was under arrest for murder and advised her of her *Miranda* rights (*Miranda v. Arizona*, 384 U.S. 436, 476-77, 16 L. Ed. 2d 694, 725, 86 S. Ct. 1602, 1629 (1966)) including her right to remain silent and to have an attorney present when questioned. Defendant was taken to the Bensenville police station immediately. At about 9:52 a.m., J. Michael Fitzsimmons, the State's Attorney of Du Page County, arrived. He testified that he advised defendant of her *Miranda* rights including her "right to an attorney." While he did not at first testify that he told defendant that she had the

right to have an attorney present at questioning the state's attorney answered a further inquiry that it was his "memory" that he told her that she had a right to have a lawyer consult with her when she was questioned.

Fitzsimmons testified that he asked the defendant if she would answer some questions; she said, "Yes; but I want to ask a question first. May I do that?" The state's attorney replied affirmatively and the defendant asked, "Is my Irv dead?" When the police officer present said that he was dead, the defendant inquired as to the "time." She was told that the shooting had taken place about 7:20 a.m. After several preliminary questions as to her identity, address and her family, defendant answered "I don't think I want to answer any more questions. Can I do that?" The state's attorney told her that she could do that and ceased his interrogation, telling her that she would be transported to the county jail and would have to appear before a judge.

Fitzsimmons then testified as follows:

"And I asked her whether she had been charged. I asked Officer—Detective Long whether or not she had been charged.

She said—The question was not directed to her. The police officer said, 'No, not yet,' and she said, 'Why not?'

And I said, 'We have to make sure that you are the one who committed the crime,' or words to that effect, 'before we can proceed.'

And she said—there may have been some preliminary conversations of other people in between, and she said, 'Well, I shot him; didn't I,' or something like that.

And then again apprised her, or started to apprise her she had a right to an attorney. I asked her if she had an attorney. She said she did not and did not want an attorney.

I told her that she would be brought before the Court to post bond. She said she didn't want to post bond and that she didn't want an attorney appointed for her, and she said she wanted to talk to her son.

I said, 'Perhaps your son will hire an attorney for you.'

She said, 'No; I did this by myself. I don't want any help from my son. I don't want an attorney,' and there was probably some more conversation about cigarettes and the location of her son and daughter, and whether or not she could talk to them and that concluded the interview."

The state's attorney testified that defendant then stated:

" 'I will just say one thing,' and then she said, 'Hell hath no'—She said, 'I love him, and I will just say one thing, Hell hath no fury as a woman scorned.' "

At this point the state's attorney said he left the conference room.

A policematron testified that when she brought the defendant into the Bensenville police station, defendant seemed to be in a daze, "Like she didn't realize what was going on around her." The matron testified that in her view the defendant remained somewhat oblivious to the events around her throughout the remainder of the day.

Richard Pawlicke, the defendant's son, testified that he arrived at his mother's house about 8:15 a.m. on the morning of the murder; found his mother drinking some wine; thought his mother was in a "state of shock" at this time, and was "too incoherent to carry on a telephone conversation." He testified that his mother showed symptoms of shock, her lips were a little discolored on the blue side, her breathing fast and shallow and she was dazed. He described his mother's intelligence as "dull."

The defendant testified that she drank two bottles of strawberry wine that morning; had taken four Librium tablets, felt very depressed and was contemplating suicide. She couldn't recall if anyone advised her of her right to have an attorney present during questioning. She stated that she was not aware that she could request the assistance of counsel during her interrogation that morning and afternoon.

Following the hearing on defendant's motion to suppress statements the court held that the noninterrogation statements made by the defendant on the morning and afternoon of January 19, 1977, were admissible but suppressed "all statements of defendant made in the presence of the State's Attorney in an interrogation situation in the conference room at the Bensenville Police Department." The People appeal from that portion of the order which suppressed all statements made in the conference room of the Bensenville Police Department on January 19, 1977.

The trial judge also found that no one "explicitly testified" that the defendant had been advised of her right to have an attorney "present with her while being questioned." This finding is erroneous since a police officer testified that he informed the defendant of her right to have a lawyer present while undergoing interrogation about an hour before the interrogation in the conference room. Hence it does appear, contrary to the trial court's finding, that the full *Miranda* warnings were recited to the defendant before her interrogation began. (In this context, see *People v. Rosario*, 4 Ill. App. 3d 642, 646 (1972).)

■■ ■ It is, of course, true that even proper warnings are of little consequence if an accused is not in fact capable of understanding the warnings and thus of making a knowing and intelligent waiver of his rights. (*People v. Turner*, 56 Ill. 2d 201, 205 (1973).) A person's use of drugs can lessen his ability to understand the *Miranda* warnings and to "knowingly and intelligently" waive his right to remain silent. (*People v.*

*Koesterer*, 44 Ill. App. 3d 468, 478-79 (1976).) However, the use of drugs or the ingestion of alcoholic beverages does not in and of itself render a subsequent admission inadmissible. "There is no *per se* rule mandating that statements made under the influence of narcotics are involuntary. Nor are they presumptively involuntary or likely to be so [citations]. Nevertheless, the Court must carefully sift the evidence in spite of the fact that the defendant's waiver may have blown his case because of 'internally generated guilt, fear, stupidity or drunkenness' or drug lethargy." *United States v. Hollis*, 387 F. Supp. 213, 220 (D. Del. 1975). See also *United States v. Brown*, 535 F.2d 424, 427 (8th Cir. 1976).

■■ While the focus must be upon a defendant's "demeanor, coherence, articulateness, his capacity to make full use of his faculties, his memory, and his overall intelligence" (*United States v. Hollis*, at 220), the fact that an accused may have been "emotionally upset" does not in and of itself create a situation which prevents questioning after the accused has been given the proper warnings. *People v. Merkel*, 23 Ill. App. 3d 298, 304 (1974).

■■ The responses to custodial interrogation by the state's attorney prior to defendant's expression of her desire not to answer further questions pose no substantial issue. The answers were made to preliminary questioning and do not involve inculpatory admissions. The substance of this appeal lies in the admissions which defendant made, apart from custodial interrogation, which the People seek to except from the *Miranda* rule. Volunteered or spontaneous statements, as opposed to admissions elicited by custodial interrogation, are "expressly excepted" from the requirements of *Miranda*. (*Miranda v. Arizona*, 384 U.S. 436, 478, 16 L. Ed. 2d 694, 726, 86 S. Ct. 1602, 1629. See also *People v. Hicks*, 44 Ill. 2d 550, 553-54 (1970).) Thus, a volunteered statement is admissible even if preceded by inadequate *Miranda* warnings or even without *Miranda* warnings. The test as to the admissibility of such statements is whether they are voluntary and the product of a rational mind. See, *e.g.*, *Townsend v. Sain*, 372 U.S. 293, 307-09, 9 L. Ed. 2d 770, 782-84, 83 S. Ct. 745, 754 (1963).

■■ In this case although the trial court found that defendant did not understand her right to have an attorney present during the questioning, it also found that all of the defendant's statements had been made voluntarily. It should also be noted that as to noninterrogation situations the court expressly found that the defendant's will "was not overborne and that defendant was not so influenced by drugs or alcohol as to render her volunteered statements" involuntary. And the evidence amply supports this conclusion. The fact that the defendant may have consumed two bottles of strawberry wine on the morning of the murder, that she had taken four Librium tablets, that she felt depressed and was

contemplating suicide; that her intelligence was "dull"; and that her attention was focused on the deceased and her emotional relationship with the deceased does not require a conclusion that her subsequent statements were involuntary. Compare *People v. Kelley*, 10 Ill. App. 3d 193, 195 (1973); *People v. Johnson*, 32 Ill. App. 3d 36, 44 (1975).

The trial court in its order concluded that the State had failed to prove that the remarks made by the state's attorney after defendant had sought to terminate the questioning were not the "prod" that elicited the further remarks of the defendant. In view of the trial court's finding in the suppression order that the "State's Attorney was dealing honestly with defendant, had no improper motive, and was not seeking to trick her," it is clear that there was no intentional "prod" of the defendant with the improper motive of seeking further answers of an inculpatory nature. Further, it is difficult to see how the particular remarks of the state's attorney could be considered any inducement to the defendant to inculpate herself. Telling the defendant that she would be taken to the county jail and be processed, asking in the defendant's presence whether she had been formally charged, explaining to her, when it appeared that she had not yet been charged, that the authorities wanted to make sure that she was the one who committed the crime before they proceeded, asking whether she had an attorney or suggesting that her son could hire one for her, in the context of this record do not amount to custodial interrogation in the *Miranda* sense. These comments by the state's attorney do not carry with them the "inherent compulsions of the interrogation process" nor the "inherent pressures of the interrogation atmosphere" (*Miranda v. Arizona*, 384 U.S. 436, 467-68, 16 L. Ed. 2d 694, 719-20, 86 S. Ct. 1602, 1624) sought to be neutralized by prior police warnings.

■■■ Thus, the trial judge was entitled to believe defendant's testimony that at no time on January 19, 1977, was she aware of the fact that she could have a lawyer present during interrogation and could on this basis properly suppress her responses to custodial interrogation prior to the time when she expressed her right to be silent. But we also conclude that the other statements made by defendant in the Bensenville station were volunteered and spontaneous and are therefore admissible. The portion of the trial court's order which suppressed those statements is therefore reversed, and the cause is remanded to the trial court for further proceedings.

Affirmed in part; reversed in part and remanded.

WOODWARD and NASH, JJ., concur.