## State of Connecticut *v.* Gary Stankowski

BOGDANSKI, PETERS, HEALEY, ARMENTANO and WRIGHT, Js.

Argued December 3, 1980—decision released May 12, 1981

*Joseph F. Keefe* and *Edward J. Peters, Jr.,* for the appellant (defendant).

*Ernest J. Diette, Jr.,* assistant state's attorney, with whom, on the brief, was *John T. Redway,* state's attorney, for the appellee (state).

ARTHUR H. HEALEY, J. After trial to a jury of twelve, the defendant was found guilty of murder in violation of General Statutes § 53a-54a (a). Upon the trial court's denial of his motions for acquittal and for a new trial, the defendant has appealed and presses seven claims of error. He contends that the trial court erred: (1) in denying his motions for judgment of acquittal; (2) in admitting statements made by him while he was in police custody; (3) in excluding the testimony of a child witness; (4) in giving the "Chip Smith" charge; (5) in its charge to the petit jury on the element of intent; (6) in its charge to the grand jury on the element of intent; and (7) in denying his post-trial motion for a new trial based on juror misconduct.

From the evidence presented at trial, the jury could have reasonably found the following: At approximately 8 p.m., on August 25, 1977, after having consumed two beers at the Hilltop Lounge, the defendant met Stephen Grant at Moodus Center. The defendant asked Grant if he wanted to smoke a marijuana cigarette, and Grant said yes. The defendant then purchased a six pack of sixteen-ounce bottles of beer and met Grant and George Hungerford at Hungerford's car. The three then

proceeded to Grant's van, in which they passed around a marijuana cigarette supplied by the defendant.

Soon Cathy Jansky, Valerie Vickers, Harold Corey and Susan Fournier arrived. In addition to the beer drunk and the marijuana smoked by the defendant and others in the van, the defendant also consumed some whiskey and later drank some gin and ginger ale.

At approximately 10:30 p.m., the defendant, Hungerford, Jansky, Vickers and Corey left the van for Hungerford's car, and then went to the defendant's house at the defendant's invitation "[t]o finish the gin and have some more marijuana . . . ." Hungerford later testified that, initially, while he, the defendant, and Corey were in Hungerford's car, with the windows rolled up, the defendant said that Vickers and Jansky should not be let into the car. After Hungerford indicated that they were "nice girls," the defendant stated that "Cathy was all right, but he really did not like Valerie."

Once at the house, they all proceeded to the loft over the Stankowski garage, where the defendant put on the radio and then played a tape, and he smoked another marijuana cigarette. After Hungerford indicated to the defendant that he was in need of bathroom facilities, the two left and relieved themselves outside of a shed behind the garage. The defendant then brought Hungerford into the garage to see a boat that his family had for sale. While in the garage, the defendant told Hungerford that he had some antique guns. The guns were locked up in a shed, but the defendant indicated to Hungerford that the door could be pulled open. The two proceeded to the shed where they pulled open the shed

door. The defendant then pulled out a .12 gauge shotgun, which he handed to Hungerford, and then reached for a .22 gauge rifle. He exchanged the rifle with Hungerford for the shotgun. The defendant reached back into the shed. Hungerford testified that he heard the defendant rustling through some shells, and told him not to "mess around with any shells." The defendant told him he "wouldn't mess around with shells." The two then left to return to the loft. Hungerford did not actually see the defendant take out any shells.

When they reached the loft, Hungerford proceeded ahead of the defendant up the stairway. Behind him, Hungerford heard the defendant making a lot of noise with the gun. "It was a lot of metal like noise, like it [the gun] was being cocked and opened up and stuff." Hungerford told the defendant that he sounded as if he were ready to go "hunting or something," to which the defendant "laughed and then he didn't say too much."

When they reached the loft, the defendant took the .12 gauge shotgun to where Vickers was seated, and pulled up a folding chair. Just before Vickers was shot, Corey told the defendant that the defendant was getting "kind of reckless" with the shotgun, and asked the defendant to "put it up." After the defendant ignored Corey's request, Corey returned to looking at the .22 gauge rifle held by Hungerford. He later overheard a conversation between the defendant and the victim wherein he heard the defendant say "something" and then heard Vickers say "go ahead," followed "seconds" later by a shotgun blast which killed Vickers. Jansky also testified that she saw the defendant point the gun at Vickers while he was seated next to Vickers, and heard him

tell Vickers that he was going to shoot her. After Vickers responded "go ahead," Jansky heard a shot go off.

## I

At the close of the state's case, at the close of all the evidence, and after the jury returned their verdict of guilty, the defendant moved for judgment of acquittal, contending that the state failed to meet the burden of proving beyond a reasonable doubt every element of the crime charged, specifically that of intent. The defendant claims that the court erred in denying these motions.

General Statutes § 53a-54a (a) provides that "[a] person is guilty of murder when, with intent to cause the death of another person, he causes the death of such person." Section 53a-3 (11) states: "A person acts 'intentionally' with respect to a result or to conduct described by a statute defining an offense when his conscious objective is to cause such result or to engage in such conduct." At trial, the defendant offered evidence to show that the shooting was accidental. He testified that once he brought the shotgun upstairs, he handed it to the deceased. The victim allegedly handled the gun for a while, discussing it with him. According to the defendant's testimony, at one point the defendant asked Vickers if she wanted to roll a "joint," to which she responded "go ahead." The defendant claimed that he then placed the gun on a table; that Vickers grabbed the end of the barrel and tapped it on the edge of the table a few times; and that she then placed two hands on the rifle and pulled it, whereupon the gun went off.

The state offered evidence to rebut the claim that the shooting was accidental. In addition to the pre-

viously described testimony of the others present on the loft, the state introduced evidence of state trooper Ronald Luneau, a fingerprint examiner, who analyzed the .12 gauge shotgun which killed Vickers. Luneau found no prints or smudges of any kind on the barrel of the shotgun. Jansky also testified that after the shooting, she checked the victim. The victim was holding a "joint" in her right hand. Both of these pieces of evidence tended to rebut the testimony of the defendant.

We have repeatedly stated the test which this court employs to determine whether the evidence is sufficient to sustain a verdict: " '[T]he issue is whether the jury could have reasonably concluded, upon the facts established and the reasonable inferences drawn therefrom, that the cumulative effect of the evidence was sufficient to justify the verdict of guilty beyond a reasonable doubt . . . .' " *State* v. *Gaynor,* 182 Conn. 501, 503, 438 A.2d 479 (1980), quoting *State* v. *Festo,* 181 Conn. 254, 259, 435 A.2d 38 (1980) ; *State* v. *Nemeth,* 182 Conn. 403, 410, 438 A.2d 120 (1980) ; *State* v. *Saracino,* 178 Conn. 416, 419, 423 A.2d 102 (1979) ; *State* v. *Jackson,* 176 Conn. 257, 262, 407 A.2d 948 (1978). "In ruling on such a motion, the evidence presented at the trial must be given a construction most favorable to sustaining the jury's verdict." *State* v. *Jackson,* supra, 262; see *State* v. *Nemeth,* supra; *State* v. *Chetcuti,* 173 Conn. 165, 172, 377 A.2d 263 (1977). Each essential element of the crime charged must be established by proof beyond a reasonable doubt, " 'and although it is within the province of the jury to draw reasonable, logical inferences from the facts proven, they may not resort to speculation and conjecture.' " *State* v. *Gaynor,* supra, 503; *State* v. *Festo,* supra, 259.

It is obvious from the verdict that the jury chose to believe the state's witnesses and to disbelieve the defendant's version of how the shooting occurred. In a jury trial, the credibility of witnesses and the weight to be given testimony is for the jury to determine. See *State* v. *Gaynor,* supra, 505; *State* v. *Ortiz,* 169 Conn. 642, 646, 363 A.2d 1091 (1975). This court cannot substitute its own judgment for that of the jury if there is sufficient evidence to support the jury's verdict.

We have stated: "Intent is a mental process which ordinarily can be proven only by circumstantial evidence." *State* v. *Zdanis,* 182 Conn. 388, 396, 438 A.2d 696 (1980), cert. denied, 450 U.S. 1003, 101 S. Ct. 1715, 68 L. Ed. 2d 207 (1981). "The intent of the actor is a question for the trier of fact, and the conclusion drawn by the trier in this regard should stand unless it is an unreasonable one." *State* v. *Holley,* 174 Conn. 22, 26, 381 A.2d 539 (1977).

Although there was not overwhelming evidence to support the finding of the requisite intent, and thus the defendant's guilt, there was sufficient evidence to support the jury's verdict. As concluded by the trial court: "From the evidence presented, the jury could have found that the defendant did not 'like' the decedent; that the defendant, despite contrary admonitions, obtained shells and deliberately loaded the shotgun before returning to the loft; that, upon returning to the loft, he pointed the loaded shotgun at the decedent and told her that he was going to shoot her; and that, when she said 'Go ahead,' he pulled the trigger. Further, the lack of any fingerprint smudges on the rifle and powder

burns on the victim's hands and person, belied the defendant's claim that the victim caused her own death by pulling on the barrel of the shotgun."[1]

## II

The defendant argues that the trial court erred in admitting statements made by him after he was taken into custody and before he was informed of his rights under *Miranda* v. *Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

---

[1] We note that the jury were fully apprised by the court on the issue of the effect which the defendant's intoxication could have had on their verdict. See General Statutes § 53a-7. Nevertheless, they found that the defendant had the requisite intent. The defendant makes no claim that the court's charge with respect to the issue of the defendant's intoxication was deficient in any way. We set out the court's charge on the murder count with respect to that issue to show its comprehensiveness: "I have to point out to you at the outset that under our statute, intoxication is not a defense to a criminal charge, but evidence of intoxication of the defendant may be offered by the defendant whenever it is relevant to negate or negative an element of the crime charged. However, the burden remains with the state to prove beyond a reasonable doubt that the defendant, in spite of any intoxication, if you find any, had the capacity to and did form the intent to cause Valerie Vickers' death when he shot her. This is due to the basic rule that the state has the burden of proving all the elements of the crime charged, including intent beyond a reasonable doubt. So, I mention this to you because I don't want you to think that the defense has the burden of proof on this. The burden overall is upon the state.

"Now, intoxication under the statute means a substantial disturbance of mental or physical capacities resulting from the introduction of substances into the body. Intoxication, whether induced by the use of intoxicating liquor or drugs, becomes significant only when it has proceeded so far that it has affected the operation of the defendant's mind to a point where it has caused a substantial disturbance of mental or physical capacities, caused by introducing such intoxicating liquor or drugs into the body. The resulting substantial disturbance of the mind or body must be such as to render the defendant incapable of forming an intent to cause the death of another person as required by the murder statute. In other words, the substantial disturbance must be of such a degree as to nullify the defendant's conscious objective to cause the result or to engage in the conduct forbidden by the murder statute. Only when and if the

On the evening in question, at about 11:45 p.m., the Colchester state police received a phone call that an accident had occurred at the Stankowski residence on Falls Road in Moodus. Upon their arrival at the residence at approximately midnight, the defendant was observed by the police to be holding a razor blade in his hand, threatening to kill himself. He screamed obscenities at the police, threatening to kill them. After a struggle, three officers man-

intoxication has reached that point does it negative the existence of the criminal intent required for murder. If it fails to reach such a point, it does not negative the existence of the criminal intent, and you may find that he had such criminal intent. On the other hand, if it does reach that point, then you must find that he did not have the necessary criminal intent to commit murder.

"As we all know, the condition of intoxication may vary in degree according to the amount and character of the liquor or drug taken, the temperament and physical characteristics of the person who takes either or both, the lapse of time between their taking and the commission of the alleged crime, and other circumstances which you may reasonably consider that I may not have mentioned, but were mentioned partly through the testimony of Dr. Stollman.

"An individual may or may not show in his behavior the present effects of liquor or drugs which he has taken and yet, still retain his faculties sufficiently to reason, to know what he is about, and to form and carry out an intent to violate the law. It is only when he is so substantially under the influence of liquor or drugs that at the time the crime was committed, he was unable to have a conscious objective to cause the result or to engage in such conduct as the law forbids. Under the murder statute then, you may find he did not have the necessary intent required by the statute. Thus, as to the third element of the crime of murder, namely, the intent to cause the death of another person, even if you are to find the defendant may have become intoxicated to some degree, if you find that the state has proved the defendant was still capable of forming an intent to cause the death of another person and that he had such intent at the time the crime was committed, and if you find the state has proved all of the other essential elements of the offense, you must find the defendant guilty of murder as charged.

"On the other hand, if you find that the state has failed to prove that at the time of the commission of the offense, the defendant was capable of forming a specific intent mentioned, and also has failed to prove that he had such specific intent, you must find the defendant not guilty of murder."

aged to subdue the defendant, who exhibited a great deal of strength; they handcuffed his hands behind his back. The defendant continued to struggle, and the police attempted to restrain him by holding him against the ground.

Since the original dispatch to the police had indicated that there was a shooting, an ambulance was sent to the scene. After the ambulance's arrival at approximately 12:10 a.m., because of the struggle and the inability of the police to control the defendant, the defendant was strapped face down on a stretcher obtained from the ambulance. The defendant, at approximately 12:15 a.m., was transported by ambulance to the Colchester police barracks. The direct ride to the barracks took around twenty minutes.

Although it is unclear when the defendant's restraints were loosened, trooper David Horan,[2] who had accompanied the defendant in the ambulance and was present at the barracks, at one point testified that within five to ten minutes after arrival at the barracks, the straps about the defendant's legs were loosened, his handcuffs were changed from behind his back to in front, and he was allowed to sit up.

At approximately 1:15 a.m., he was warned of his *Miranda* rights. From the time the police took the defendant into custody to the time he was given his *Miranda* rights, trooper Horan testified that neither he, nor anyone in his presence, asked the defendant any questions.

---

[2] Trooper David Horan arrived at the Stankowski residence at approximately midnight, rode with the defendant to the barracks, and stayed with him during the time in question.

The defendant attempted to suppress various inculpatory and exculpatory statements made by him, and recorded by trooper Horan, after he had been taken into custody and before he was given his *Miranda* rights. After a hearing, the court admitted the statements. On appeal, the defendant claims that the court erred in refusing to suppress the statements made during that time. His argument appears to be two-pronged: (1) the statements are inadmissible because they were not voluntarily given; and (2) they are not admissible because they were uttered prior to the time he was advised of his *Miranda* rights.

## A

We first examine whether the defendant's statements are inadmissible because they were involuntarily given. The ultimate test of the admissibility of such statements is their voluntariness. See *Culombe* v. *Connecticut,* 367 U.S. 568, 602, 81 S. Ct. 1860, 6 L. Ed. 2d 1037 (1961); *Rogers* v. *Richmond,* 365 U.S. 534, 544, 81 S. Ct. 735, 5 L. Ed. 2d 760 (1961); *State* v. *Staples,* 175 Conn. 398, 406, 399 A.2d 1269 (1978). The state is required to prove, by a preponderance of the evidence, that under all the circumstances a particular confession is voluntary. *Lego* v. *Twomey,* 404 U.S. 477, 489, 92 S. Ct. 619, 30 L. Ed. 2d 618 (1972); *State* v. *Hawthorne,* 176 Conn. 367, 370, 407 A.2d 1001 (1978); *State* v. *Staples,* supra, 406–407; *State* v. *Vollhardt,* 157 Conn. 25, 34, 244 A.2d 601 (1968). "The issue of whether a confession is voluntary and admissible is, in the first instance, one of fact for determination by the trial court in the exercise of its legal discretion. *State* v. *Devine,* 149 Conn. 640, 652, 183 A.2d

612 (1962). That discretion must, however, be exercised in accordance with constitutional standards of due process. *State* v. *Staples,* [supra, 408]." *State* v. *Derrico,* 181 Conn. 151, 162–63, 434 A.2d 356, cert. denied, 449 U.S. 1064, 101 S. Ct. 789, 66 L. Ed. 2d 607 (1980).

We have stated that " ' "the test of voluntariness is whether an examination of all the circumstances discloses that the conduct of 'law enforcement officials was such as to overbear [the defendant's] will to resist and bring about confessions not freely self-determined . . . .' *Rogers* v. *Richmond,* 365 U.S. 534, 544, [81 S. Ct. 735, 5 L. Ed. 2d 760] (1961)." ' " *State* v. *Staples,* supra, 408; see *State* v. *Derrico,* supra, 163. "The ultimate test remains . . . . 'Is the confession the product of an essentially free and unconstrained choice by its maker? If it is, if he has willed to confess, it may be used against him. If it is not, if his will has been overborne and his capacity for self-determination critically impaired, the use of his confession offends due process.'" *Schneckloth* v. *Bustamonte,* 412 U.S. 218, 225, 93 S. Ct. 2041, 36 L. Ed. 2d 854 (1973), quoting *Culombe* v. *Connecticut,* supra, 602; see *State* v. *Derrico,* supra.

The trial court concluded: "There was no evidence of any mistreatment, threats or promises or physical or mental abuse which would deprive an otherwise rational mind of the exercise of free will and power of decision and discernment. The record in this case is totally devoid of any indication that the defendant was subjected to this sort of coercion or intimidation either while he was riding back to the barracks or while he was being held at the bar-

racks."[3]  On the basis of a review of the evidence before it, we cannot conclude that the trial court erred in holding that the defendant's statements were not involuntary.

An examination of the record before us discloses that there is no indication, from the time the defendant was taken into custody to the time when he was given his *Miranda* rights, that the defendant was coerced into giving the statements which he now claims are inadmissible.  The record does not indicate any attempt by the police to elicit any statements from the defendant.  The defendant makes no claim that the police verbally interrogated him, or that the police used any threats, promises or offers of leniency to obtain a confession.  The restraint employed by the police in handcuffing the defendant and transporting him by stretcher was reasonably necessary in view of the defendant's attempts to prevent the police from restraining him, and in light of his threats of taking his own life and those of the police officers.  Upon his arrival at the

---

[3] The court continued: "The record should reflect the fact that in arriving at this conclusion, the court has taken into account the fact that he was on the stretcher and handcuffed for at least a portion of this time.  However, since the time period involved— although there was testimony of time that stretched it out to an hour, clearly the mathematical computation puts it somewhere in the vicinity of twenty-five to thirty minutes.  This court cannot say that the actions of the police in that situation were unreasonable or coercive, particularly in light of the accused's conduct when the police arrived at the scene where he was threatening to take his life and threatening the lives of other people and so forth.  Consequently, given the totality of the circumstances and the applicable rules the court stated for the record, it first finds that the statements made were voluntary.  This finding is made under the totality of the circumstances then and there existing, including those — the mental and physical state of the defendant including his voluntary ingestion of alcohol."

barracks, his leg restraints were soon thereafter loosened and he was allowed to sit up with his hands cuffed in front of him.

The time period involved in the episode in question is also significant in determining the possible existence of any psychological pressures on the defendant to give a statement. The whole period in question lasted, at most, a little over an hour: the police first confronted the defendant around midnight; he was handcuffed, placed on a stretcher, and then transported by ambulance directly to the police barracks at approximately 12:15 a.m.; he arrived at the barracks around 12:35 a.m.; and he was advised of his *Miranda* rights at approximately 1:15 a.m.

Although the defendant was in his teens, he was not in his early teens; at the age of nineteen he had already passed the age of majority in our state. General Statutes § 1-1d. There is no claim that he was intellectually or psychologically deficient in any way.

The defendant argues that due to his ingestion of alcohol and use of marijuana, both of which were self-induced, his statements cannot be deemed to be voluntary. "[T]he use of drugs or the ingestion of alcoholic beverages does not in and of itself render a subsequent admission inadmissible." *People* v. *Pawlicke,* 62 Ill. App. 3d 791, 796, 379 N.E.2d 798 (1978); see *United States* v. *Brown,* 535 F.2d 424, 427 (8th Cir. 1976); *State* v. *Peterson,* 366 A.2d 525 (Me. 1976). It is one factor to be considered in determining the voluntariness of a statement. See *State* v. *Peterson,* supra; *Commonwealth* v. *Jones,* 457 Pa. 423, 322 A.2d 119, 125 (1974).

Despite the fact that the defendant had ingested alcoholic beverages and had used marijuana before the killing, both troopers Martin Hart and David Horan testified that the defendant's statements during the time in question were not slurred and were comprehensible. Trooper Hart testified that before the defendant was placed in the ambulance, the defendant's speech was not slurred, he did not hiccup, belch or vomit, nor did he appear to sway or stagger while walking. He was alert to the presence of the officers.

Trooper Horan, who accompanied the defendant in the ambulance and was with him at the barracks, testified that during the time he was with the defendant, the defendant's speech was not mumbled or slurred; he did not hiccup or belch, or give any indication of the need to vomit. About fifteen minutes after the defendant was advised of his rights, the defendant was allowed to walk to a vending machine, about twenty feet away, to purchase a package of cigarettes; soon thereafter, he used the bathroom facilities. During both times, he did not appear either to stumble or to sway.

We conclude that, upon a review of the record, there is sufficient evidence to support the trial court's conclusion that the defendant's will was not overborne and that his statements were not involuntarily made. See *State* v. *Derrico,* supra, 163–65; cf. *Rogers* v. *Richmond,* supra; *Culombe* v. *Connecticut,* supra.

## B

We next examine whether the defendant's statements are inadmissible because they were uttered prior to the time he was given his *Miranda* warn-

ings. *Miranda* held that "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the [fifth amendment's] privilege against self-incrimination." *Miranda* v. *Arizona,* supra, 444. Before one suspected of the commission of a crime is entitled to the warnings constitutionally required by *Miranda,* however, two conditions must be satisfied: the suspect must be in the custody of law enforcement officials; *Oregon* v. *Mathiason,* 429 U.S. 492, 495, 97 S. Ct. 711, 50 L. Ed. 2d 714 (1977); *Beckwith* v. *United States,* 425 U.S. 341, 344–48, 96 S. Ct. 1612, 48 L. Ed. 2d 1 (1976); and the suspect must be subjected to interrogation. *Rhode Island* v. *Innis,* 446 U.S. 291, 100 S. Ct. 1682, 64 L. Ed. 2d 297 (1980); *Miranda* v. *Arizona,* supra, 444. The defendant was clearly in custody during the time period in question. The question becomes whether he was the subject of police interrogation.

In *Rhode Island* v. *Innis,* supra, the United States Supreme Court defined what conduct amounted to "interrogation" for *Miranda* purposes. The court stated: "[T]he term 'interrogation' under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect. The latter portion of this definition focuses primarily upon the perceptions of the suspect, rather than the intent of the police. . . . A practice that the police should know is reasonably likely to evoke an incriminating response from a suspect thus amounts to interrogation. But, since the police

surely cannot be held accountable for the unforeseeable results of their words or actions, the definition of interrogation can extend only to words or actions on the part of police officers that they *should have known* were reasonably likely to elicit an incriminating response." *Rhode Island* v. *Innis,* supra, 301–302.

Under the facts of this case, we cannot conclude that the defendant was interrogated so as to invoke the *Miranda* warnings. The defendant makes no claim that the police or anyone else verbally questioned him during the time at issue. Trooper Horan, in fact, testified on several occasions that neither he nor anyone else in his presence asked the accused any questions.

The issue is then whether the defendant can be deemed to have been subjected to the "functional equivalent" of interrogation. Upon a review of all of the circumstances in this case, we hold that he was not.

Although the test in *Innis* is an objective one, the Supreme Court noted that the intent of the police is not irrelevant. This is so "for it may well have a bearing on whether the police should have known that their words or actions were reasonably likely to evoke an incriminating response. In particular, where a police practice is designed to elicit an incriminating response from the accused, it is unlikely that the practice will not also be one which the police should have known was reasonably likely to have that effect." *Rhode Island* v. *Innis,* supra, 301–302 n.7. There is clearly no indication from the record that the police conduct in this case was designed to elicit incriminating utterances from the defendant. Although trooper Horan took notes of

the defendant's statements, this factor cannot alone be decisive of an intent to interrogate, "for a law officer would be derelict in his duty not to log an accused's incriminating statements . . . ." *United States* v. *Voice,* 627 F.2d 138, 145 (8th Cir. 1980). We simply cannot conclude that the defendant was subjected to any words of or actions by the police that the police should have known were reasonably likely to elicit incriminating responses from the defendant. Cf. *State* v. *Krajger,* 182 Conn. 497, 438 A.2d 745 (1980).

### III

The defendant claims that the court erred in excluding the testimony of a six-year-old child, Stephen Stankowski, who is a nephew of the defendant. During the trial, the defendant made an offer of proof regarding testimony of Stephen to the effect that Stephen had previously loaded the shotgun which later was involved in the fatal shooting. Out of the presence of the jury, the defendant's attorney, the state's attorney and the trial judge all asked Stephen a number of questions. In addition, the defendant's witness, Dr. Mark Kaplan, a clinical psychologist, testified as to Stephen's intelligence and psychological make-up. Kaplan also provided the court with a seven-page report of his examination of Stephen.

After Kaplan testified, the trial judge ruled that he was of the opinion that the child was not competent to testify. He stated: "[E]ven in the most liberal stretch of the rule that I can make, the witness is not qualified."[4]

[4] He soon thereafter stated: "As I said, even under the most broad interpretation of the rule, I just can't allow this boy to testify. Believe me, if I felt there was any way that I could I

This court recently has had occasion to discuss the standards by which the competency of a child witness to testify is to be determined. "The testimonial capacity of a child witness is a matter for the court to determine upon inquiry. *State* v. *Segerberg,* 131 Conn. 546, 547, 41 A.2d 101 (1945). In Connecticut, the examination to determine the competency of a witness is usually conducted by counsel under direction of the court, except insofar as the court may find it advisable to intervene. See *State* v. *Orlando,* 115 Conn. 672, 676, 163 A. 256 (1932). Because the competency of a witness is a matter peculiarly within the discretion of the trial court, its ruling will be disturbed only in a clear case of abuse or of some error in law. *State* v. *Siberon,* 166 Conn. 455, 457, 352 A.2d 285 (1974); *State* v. *Orlando,* supra, 675; *Kuczon* v. *Tomkievicz,* 100 Conn. 560, 572–73, 124 A. 226 (1924).

"In determining the competency of child witnesses, age is not the decisive factor. See *Kuczon* v. *Tomkievicz,* supra, 570; McCormick, Evidence (2d Ed.) § 62. Instead, the trial court must consider 'the proposed witness' maturity to receive correct impressions by his senses, ability to recollect and narrate intelligently, and ability to appreciate the moral duty to tell the truth.' *State* v. *Siberon,* supra, 458. The witness should also have an intelligent comprehension of the facts sought to be developed. See *State* v. *Segerberg,* supra, 548; *Kuczon* v. *Tomkievicz,* supra, 570; *McCormick,* loc.

would." The rule to which the trial court judge referred was that of *State* v. *Siberon,* 166 Conn. 455, 352 A.2d 285 (1974), which was cited with approval in *State* v. *Rodriguez,* 180 Conn. 382, 389, 429 A.2d 919 (1980).

cit." *State* v. *Rodriguez,* 180 Conn. 382, 389, 429 A.2d 919 (1980). See also 2 Wharton, Criminal Evidence (13th Ed.) §§ 379–380.

Upon review of the evidence, we cannot conclude that the trial judge abused his discretion by not allowing Stephen Stankowski to testify. The trial judge, who has the advantage of viewing the child first hand, and observing the child's demeanor and ability to answer questions posed to him, could have reasonably come to the conclusion that Stephen did not have the ability to recollect and narrate intelligently, or the ability to appreciate the moral duty to tell the truth.[5]

---

[5] Although the printed record cannot, itself, fully demonstrate the demeanor, maturity, responsiveness or abilities of the child, i.e., those factors which went into the trial court's determination, the transcript regarding the examination of the child witness adequately supports the trial court's conclusion. Portions of that transcript include the following:

"By Mr. Redway [State's Attorney]:

Q. Stephen, how do you feel today?

A. Good.

Q. Stephen, you told us how old you were and you said you were six years old, right?

A. Yes.

Q. Do you know your birth date, Stephen?

A. The second.

Q. The second of what? Do you know what date your birthday falls on?

A. No.

Q. Stephen, you said you went to kindergarten?

A. Yes.

Q. What is your teacher's name?

A. Miss Warzecha.

Q. What do you do when you go to kindergarten?

A. Play.

Q. Do you have fun playing?

A. Yes.

Q. Do you do anything else while you are in kindergarten?

A. Yes.

Q. What is that?

## IV

The defendant contends that the court erred in giving a supplemental instruction to the jury. After

A. See-saw.

Q. Do you do any writing when you are in kindergarten?

A. Yes.

Q. Do you know how to write your name?

A. Yes.

Q. Do you know the alphabet?

A. Yes.

Q. Can you say the alphabet for me?

(Witness responds by reciting alphabet, but most letters are unintelligible.)

Q. Do you know how to count?

A. Yes.

Q. Can you count up to twenty for me?

(Witness counts to twenty, but most numbers are unintelligible.)

Q. You indicated or you told Mr. Peters that you lived on Falls Road?

A. Yes.

Q. Do you know the name of the town that you live in?

A. No.

Q. Who lives with you at Falls Road?

A. Gary.

Q. Anybody else live with you?

A. Frankie and Grandma.

Q. Anybody else live with you there?

A. Debbie.

Q. Debbie lives with you, too?

A. Yes.

Q. Anybody else live with you at that location?

A. No.

Q. Do you go to church, Stephen?

A. Yes.

Q. You do?

A. Yes.

Q. When do you go to church, Stephen?

A. Friday.

Q. Where do you go to church, Stephen?

A. I don't know.

Q. How often do you go to church, Stephen?

A. One week.

Q. Do you go to church every week?

the jury had been deliberating for approximately
two and one-half days, they came back and asked

T. No, just one week.

Q. Just one week?

A. Yes.

Q. Do you know how many times you have been to church, Stephen?

A. One time.

Q. Just one time you have been in church?

A. Yes.

Q. Who did you go to church with?

A. Frankie and Gary.

Q. Do you go to Sunday School?

A. Yes.

Q. You do?

A. (Nodding affirmatively.)

Q. Do you go every week?

A. Yes.

Q. What is your Sunday School teacher's name?

A. Miss Warzecha.

Q. Not kindergarten. I am talking about church school. Do you go to church school?

A. Yes.

Q. Where is that?

A. Falls Road.

Q. Is that where the church is?

A. Yes.

Q. Is the church near your home, Stephen?

A. Yes.

Q. How far is it from your home?

A. A little ways.

Q. Do you know the name of the church?

A. (Nodding negatively.)

Q. You don't know?

A. No.

Q. Do you believe in God?

A. Yes.

Q. Who taught you to believe in God?

A. My Grandma.

Q. Do you know what it is to tell a lie, Stephen?

A. No.

Q. Do you know what would happen to you if you told a lie?

A. Yes.

Q. What would happen to you?

the trial court whether they had "to reach a unanimous decision on the first or more serious charge

A. You 'pologize (sic).

Q. I don't understand that word, Stephen. Can you state it again?

A. 'Pologize.

Q. You apologize, is that what it is?

A. Yes.

Q. What do you mean by that, Stephen?

A. Like sometimes you lie.

Q. What happens when you lie?

A. You 'pologize.

Q. What does that mean, Stephen? I don't understand that word. Sometimes I have trouble understanding things.

A. Like you lie.

Q. Do you mean that once you lie, you have to say you're sorry?

A. Yes.

Q. But you don't know what a lie is, Stephen?

A. (Nodding negatively.)

Q. Would anything happen to you, Stephen, if you lied?

A. Yes.

Q. What would that be?

A. I don't know.

Q. Do you know why you are in court, Stephen?

A. Yes.

Q. Why are you in court?

A. To ask the truth.

Q. Do you know what you are supposed to say when you come into court?

A. (Nodding affirmatively.)

Q. What is that, Stephen?

A. I don't know.

Q. You like Gary, don't you?

A. Yes.

Q. You like Frankie?

A. Yes.

Q. If Gary or Frankie asked you to say something, would you say it?

A. Yes.

Q. Why? Because you like them?

A. Yes.

Q. If they told you it would be okay to tell a lie, would you do it?

A. No.

Q. You wouldn't do it then?

A. No.

before considering the lesser charge?" After the
trial court answered yes and explained its answer,

Q. Why not?
A. I don't know.
Q. Stephen, when was the last time you were at school?
A. I don't know.
Q. Stephen, have you ever seen me before?
A. Yes.
Q. Where did you see me before?
A. Outside.
Q. Ever see Mr. Peters before?
A. Yes.
Q. Where did you see him before?
A. I don't know.
Q. Stephen, Mr. Peters asked you some questions before. Is
that right?
A. Yes.
Q. Do you remember the questions he asked you?
A. Yes.
Q. Did he ever ask you those questions before?
A. Yes.
Q. Did he ask you those questions before many times?
A. Yes.
Q. Can you tell me how many times?
A. All day.
Q. Stephen, do you know how long ago Christmas was?
A. Yes.
Q. Do you remember Christmas?
A. Yes.
Q. Why do you remember Christmas, Stephen?
A. Before I like it.
Q. Do you remember how long ago that was?
A. Yes.
Q. How long was that?
A. A long day.
Q. Do you remember when this thing happened with Gary?
A. Yes.
Q. Did that happen before Christmas or after Christmas?
A. After Christmas.
Q. Stephen, what else happens to people when they tell lies?
A. I don't know.
          Mr. Redway:  No further questions.
          The Court:  Mr. Peters [defendant's attorney].
By Mr. Peters:
Q. Stephen, if the Judge allowed you to testify, would you lie?
A. No.

it then gave the jury a charge on the role and
responsibility of the jurors, commonly referred to

Q. Do you remember something that you did last summer?
A. Yes.
   Mr. Peters: No further questions, your Honor.
By the Court:
Q. Stephen, do you know what the word testify means?
A. No.
Q. Why do you remember Christmas?
A. I don't know.
Q. Do you get presents at Christmas time?
A. Yes.
Q. Do you remember what present you got last Christmas?
A. Yes.
Q. What did you get?
A. A bike.
Q. What kind of bike, three wheels or two wheels?
A. Three wheels.
Q. Do you remember going to church?
A. Yes.
Q. Do you remember the name of the church?
A. No.
Q. Who is the man or lady who runs things at the church, do you remember?
A. No.
Q. Do you have friends in kindergarten?
A. Yes.
Q. Who is your best friend?
A. Mark.
Q. Do you know where Mark lives?
A. No.
Q. Do you know Mark's last name?
A. Mark Shasso (sic).
Q. How old is Mark?
A. Six.
Q. Do you know the name of the people who live next door to you on Falls Road?
A. No.
Q. Do you know what happens to you when you tell a lie?
A. Yes.
Q. What is that?
A. You 'pologize.
   The Court: All right, no other questions.
   Mr. Peters: I have none, your Honor.
   Mr. Redway: I have no further questions."

as a "Chip Smith" instruction.[6] See *State* v. *Smith*, 49 Conn. 376 (1881). The defendant objected to the giving of the charge, contending that the charge violated his due process of law and right to a jury trial under article first, § 8 of the Connecticut constitution because it coerces the "jurors individually into listening to and adopting the conclusions of their fellow jurors."

---

[6] The court stated: "The last question which you sent out reads as follows: 'Does the jury have to reach a unanimous decision on the first or more serious charge before considering the lesser charge?'

"The answer to the question is yes. You make a decision on the greater charge first and then you go on to the lesser charge, if you decide that the accused is not guilty of murder in the first degree on the first charge. Then and only then will you consider the lesser included charge.

"Now, there is something else at this point that I do want to say to you because of what your question implies. I want to point out to you that although the verdict to which each juror agrees must be, of course, his or her own conclusion and not a mere acquiescence in the conclusions of their fellow jurors, yet, in order to bring twelve minds to a unanimous result, all of the jurors should examine with candor the questions submitted to them and with due regard and in deference to the opinion of the other jurors in conferring together, the jury ought to pay proper respect to each other's opinions and listen with candor to each other's argument. If much the larger number of the panel are for a conviction, a dissenting juror should consider whether the doubt in his or her mind is a reasonable one which makes no impression upon the minds of so many men and women equally honest and equally intelligent as himself or herself, who have heard the same evidence with the same attention and with equal desire to arrive at the truth and under the sanction of the same oath. On the other hand, if the majority are for acquittal, the minority ought seriously to ask themselves whether they may not reasonably and ought not to doubt the conclusions of the judgment which is not concurred in by most of those with whom they are associated and distrust the weight or sufficiency of that evidence which fails to carry conviction to the minds of their fellow jurors.

"With that, ladies and gentlemen, I am going to send you back to the jury deliberating room. I will give the clerk the page with the question and again, it is to remain a part of the record of this case. You may now retire."

We disagree. We have had recent occasion to note: "The possibility of disagreement by the jury is implicit in the requirement of a unanimous verdict and is part of the constitutional safeguard of trial by jury. See *United States* v. *Harris,* 391 F.2d 348, 355 (6th Cir. [1968]); *Thaggard* v. *United States,* 354 F.2d 735, 740 (5th Cir. [1965]) (Coleman, J., concurring specially); *Jenkins* v. *United States,* 330 F.2d 220, 222 (D.C. Cir. [1964]) (Wright, J., dissenting), rev'd, 380 U.S. 445, 85 S. Ct. 1059, 13 L. Ed. 2d 957 [1965]; *Green* v. *United States,* 309 F.2d 852, 856 (5th Cir. [1962]). . . . While a defendant is not entitled to an instruction that a jury may 'hang'; *United States* v. *Sawyers,* 423 F.2d 1335, 1340 (4th Cir. [1970]); *United States* v. *Bowles,* 428 F.2d 592, 596 (2d Cir.), cert. denied, 400 U.S. 928, 91 S. Ct. 193, 27 L. Ed. 2d 188 [1970]; he is entitled to a jury unfettered by an order to decide. *Jenkins* v. *United States,* 380 U.S. 445, 446, 85 S. Ct. 1059, 13 L. Ed. 2d 957 [1965]." *State* v. *Peary,* 176 Conn. 170, 183–84, 405 A.2d 626 (1978), quoting *State* v. *Ralls,* 167 Conn. 408, 421–22, 356 A.2d 147 (1974).

In the present case, the court's charge cannot be said to have coerced the jurors. When read as a whole, the charge adequately apprised the jurors of their individual responsibility both to reconsider their opinion and "to reach his or her own conclusion," and not merely to acquiesce in the conclusions of others. See *United States* v. *Robinson,* 560 F.2d 507, 517 (2d Cir. 1977), cert. denied, 435 U.S. 905, 98 S. Ct. 1451, 55 L. Ed. 2d 496 (1978). We cannot conclude that the court's charge, when read as a whole, was prejudicial to the defendant. See *State* v. *Peary,* supra; *State* v. *Martinez,* 173 Conn. 541, 378 A.2d 517 (1977); *State* v. *Ralls,* supra; *State* v.

*Keeler,* 164 Conn. 42, 316 A.2d 782 (1972) ; *Tough* v. *Ives,* 162 Conn. 274, 294 A.2d 67 (1972) ; *State* v. *Walters,* 145 Conn. 60, 138 A.2d 786, cert. denied, 358 U.S. 46, 79 S. Ct. 70, 3 L. Ed. 2d 45 (1958) ; *State* v. *Schleifer,* 102 Conn. 708, 130 A. 184 (1925) ; *State* v. *Smith,* supra.[7]

## V

The defendant also claims that the trial court erred in its instruction to the trial jury on the issue of intent as an element of the crime of murder. He specifically contends that the court's charge impermissibly shifted the burden of proof to him, thereby violating his constitutional protections of the presumption of innocence and of due process of law as guaranteed by the fourteenth amendment to the United States constitution. See *Sandstrom* v. *Montana,* 442 U.S. 510, 99 S. Ct. 2450, 61 L. Ed. 2d 39 (1979). He takes issue with that portion of the charge which stated: "A person's intentions may be inferred from his conduct. Every person under the law is presumed to intend the natural and necessary consequences of his acts."[8]

---

[7] The defendant also objected to the timeliness of giving the charge since the jury had not reported a deadlock. Although such a charge "has *customarily* been deferred until after a disagreement has been reported"; (emphasis added) *State* v. *Walters,* 145 Conn. 60, 64, 138 A.2d 786, cert. denied, 358 U.S. 46, 79 S. Ct. 70, 3 L. Ed. 2d 45 (1958) ; a reported deadlock is not a prerequisite to giving the charge. In this case, even though a deadlock had not been reported, the jury had been deliberating for two and one-half days, and had sent the court a question which indicated they were having a problem with the concept of unanimity with regard to the more serious offense.

[8] After the trial court discussed the first two elements of the crime of murder, it stated: "Now, the third element which the state must prove, and that is obviously a crucial element in this case, is that the person causing the death of the other person must have done so with intent to cause such death. In other words, the state must

On a number of recent occasions, this court has reviewed claims based on an alleged violation of

prove beyond a reasonable doubt that the accused shot Valerie Vickers with the intent to cause her death.

"Now, intent is a mental process. A person's intentions may be inferred from his conduct. Every person under the law is presumed to intend the natural and necessary consequences of his acts. It is often impossible and never necessary to prove criminal intent by direct evidence. Ordinarily, intent can be proved only by circumstantial evidence, as I have explained that term to you. What a person's purpose or intention has been is necessarily very largely a matter of inference. A person may take the stand and testify directly as to what his or her purpose or intention was. That testimony you can believe or not, according to whether or not you feel it warrants belief, but no witness can be expected to come here and testify that he looked into another person's mind and saw therein a certain purpose or intention. The only way in which a jury can determine what a person's purpose or intention was at any given time, aside from the person's own testimony, is by determining what that person's conduct was and what the circumstances were surrounding that conduct, and from those, infer what his purpose or intention was. To draw such an inference is not only permitted, but it is also the duty of a jury, provided, of course, the inference drawn is a reasonable one, as I have previously pointed out to you."

The defendant also takes issue with the charge given on manslaughter, which reads as follows: "Now, intent, as I have already explained to you, is a mental process. I have described to you how that process operates and how it may or may not be proved by the state. The person's intention may be inferred from his conduct. Here, I am, in effect, repeating what I have already told you and that is to say, every person is presumed to intend the natural and necessary consequences of his acts. It is often impossible and never necessary to prove criminal intent by direct evidence. Ordinarily, intent can be proved only by circumstantial evidence, as I have defined that term for you. What a person's purpose or intention has been is necessarily very largely a matter of inference.

"A person may take the stand and testify directly as to what his or her purpose or intention was or was not. That testimony, as I have told you, can be believed by you or not, according to whether or not you feel it warrants belief, but no witness can be expected to come here and testify that he looked into another person's mind and saw therein a certain purpose or intention. The only way which a jury can determine what a person's purpose or intention was at any given time, aside from that person's own testimony, is by determining what that person's conduct was and what the circumstances

*Sandstrom* v. *Montana,* supra.[9]   See, e.g., *State* v. *Brokaw,* 183 Conn. 29, 33–34, 438 A.2d 815 (1981); *State* v. *Truppi,* 182 Conn. 449, 452–59, 438 A.2d 712 (1980), cert. denied, 451 U.S. 941, 101 S. Ct. 2024, 68 L. Ed. 2d 329 (1981); *State* v. *Theriault,* 182 Conn. 366, 379–80, 438 A.2d 432 (1980); *State* v. *Vasquez,* 182 Conn. 242, 245–53, 438 A.2d 424 (1980); *State* v. *Maselli,* 182 Conn. 66, 75–78, 437 A.2d 836 (1980), cert. denied, 449 U.S. 1083, 101 S. Ct. 868, 66 L. Ed. 2d 807 (1981); *State* v. *Perez,* 181 Conn. 299, 315, 435 A.2d 334 (1980); *State* v. *Arroyo,* 180 Conn. 171, 173–74, 429 A.2d 457 (1980). We have cautioned that the *Sandstrom* holding must not be oversimplified; see *State* v. *Vasquez,* supra, 248; *State* v. *Arroyo,* supra, 175; and that other instructions may be adequate to overcome the potential for confusing the jury on the issue of inferences and presumptions with regard to intent. See *State* v. *Vasquez,* supra; *State* v. *Arroyo,* supra, 175–76; *State* v. *Harrison,* 178 Conn. 689, 697, 425 A.2d 111 (1979).

We have carefully examined the entire charge and have concluded that the instructions on the

were surrounding that conduct, and from those, infer what his purpose or intention was at the time the conduct was engaged in."

During their deliberations, the jury requested the trial court to instruct them again on the definitions of murder and manslaughter. In response, the court thereafter reinstructed them, and gave almost verbatim its earlier charges with respect to the two crimes.

[9] In *Sandstrom* v. *Montana,* 442 U.S. 510, 99 S. Ct. 2450, 61 L. Ed. 2d 39 (1979), the United States Supreme Court held that a jury instruction that "the law presumes that a person intends the ordinary consequences of his voluntary acts" violates the due process clause of the fourteenth amendment, because a reasonable juror could interpret this instruction as a burden-shifting presumption, like that invalidated in *Mullaney* v. *Wilbur,* 421 U.S. 684, 95 S. Ct. 1881, 44 L. Ed. 2d 508 (1975), or as a conclusive presumption, like those invalidated in *United States* v. *United States Gypsum Co.,* 438 U.S. 422, 98 S. Ct. 2864, 57 L. Ed. 2d 854 (1978), and *Morissette* v. *United States,* 342 U.S. 246, 72 S. Ct. 240, 96 L. Ed. 288 (1952).

element of intent did not violate the defendant's constitutional rights as claimed. Prior to giving the charge on intent that is attacked, the court instructed at length on the matter of circumstantial evidence and inferences; the terms "infer" and "inference" were specifically and repeatedly explained in permissive terms. The jury were informed that "you *may* draw inferences from the facts that *you find to be established* in the case" and that any "[i]nferences that you *may* draw from these established facts must be logical and reasonable and well founded upon the facts which have been proven during the course of the trial." (Emphasis added.) The sentence before the portion objected to was "[a] person's intentions *may* be inferred from his conduct." This sentence, together with the portions attacked, appeared in the court's charge not only after but also before language instructing on the permissive nature of the jury's function in drawing inferences.

The court also pointed out that the element of intent "is obviously a crucial element in this case" which the state must prove beyond a reasonable doubt. The court made clear, both as to murder and manslaughter, that it was for them to decide whether the state had proven beyond a reasonable doubt the element of intent. The court charged at length on the matter of intoxication and its bearing on the jury's determination of the element of intent. Evidence that the state claimed tended to demonstrate the existence of the requisite intent, as well as evidence the defense claimed tended to negate such intent, was commented upon. In its summary at the end of the charge, the court told the jury that it was for them to decide whether the defendant had the intent to cause the death of the victim, or that

he had the intent only to cause her serious physical injury or, as the defense claimed, that· "he had no intention of any kind to cause any harm, neither death nor serious physical injury." The court's instructions placed the burden of proof squarely on the state as to every essential element of the crime. They pointed out that the defendant "does not have to prove ·his innocence" and adequately instructed the jury on the defendant's presumption of innocence.

We are aware that general instructions on the burden of proof or the presumption of innocence do not in and of themselves dispel the possibility that the jury could have interpreted the instruction on intent in an unconstitutional manner. See *Sandstrom* v. *Montana,* supra, 518 n.7. Such instructions, however, may be considered with all other instructions relevant to the claim raised to determine whether the jury could have interpreted the presumption involved to be either conclusive or burden-shifting and, thus, unconstitutional. See *State* v. *Vasquez,* supra, 248.

The instructions in this case which the defendant attacks are very similar to the murder instructions which we upheld in *State* v. *Arroyo.*[10] Upon review,

---

[10] With respect to the crime of murder, the trial court in *State* v. *Arroyo* charged:  " '[I]ntent is a mental process. A person's intention may be inferred from his conduct. Every person is presumed to intend the natural probable consequences of his acts. . . . It is often impossible and never necessary to prove criminal intent by direct evidence. Ordinarily, intent can be proved only by circumstantial evidence as I have explained that term to you. Now, as to intent which a person may have, that is what a person's purpose, design, intention was is necessarily a matter of inference. A man may take the. witness stand and testify directly as to what his purpose or intention was, and that testimony you can believe or not, according to whether or not it warrants belief or not. But no wit-

we conclude that the attacked portions of this charge, when considered in light of the charge as a whole, including the explanatory instructions on inference and circumstantial evidence, could not be reasonably construed to require a conclusive presumption or a shifting of the burden of proof, and did not deprive the defendant of his due process right to a fair trial. See *State* v. *Arroyo,* supra.

## VI

The defendant also claims that the court erred in its instruction to the grand jury on the issue of intent as an element of the crime of murder. He contends that the court's charge to the grand jury impermissibly shifted the burden of proof to him, thereby violating his constitutional protection of the presumption of innocence and of due process of law.

In *State* v. *Stepney,* 181 Conn. 268, 435 A.2d 701 (1980), cert. denied, 449 U.S. 1077, 101 S. Ct. 856, 66 L. Ed. 2d 799 (1981), we considered the question whether the prohibitions enunciated in *Sandstrom*

---

ness can be expected to come here and testify that he looked into another person's mind and saw therein a certain purpose or intention or certain knowledge. The only way in which a jury can determine what a person's purpose or intention was, at any given time, aside from that person's own testimony, is by determining what that person's conduct was and what the circumstances were surrounding that conduct, and from those, infer what his purpose or intention was. Now to draw such an inference is not only the privilege, but it is also the duty of a jury, provided, of course, the inference drawn is a reasonable one and a logical one. Now, one that uses a deadly weapon upon a vital part of another will be deemed to have intended the probable result of that act, and from such a circumstance a proper inference may be drawn in some cases that there was the intent to cause the death. Any inference that may be drawn from the nature of the weapon and the manner of its use, is an inference of fact to be drawn from the jury upon consideration of these and other circumstances in the case.' " *State* v. *Arroyo,* 180 Conn. 171, 177–78, 429 A.2d 457 (1980).

regarding instructions delivered to a petit jury on the issue of criminal intent were applicable in grand jury proceedings. For the reasons stated therein, we concluded that "the interests intended to be protected by the prohibitions delineated in *Sandstrom* with regard to a petit jury are not equally imperiled within the context of a grand jury proceeding as conducted in this state . . . ." *State* v. *Stepney,* supra, 271. Accordingly, we find no error with regard to this claim.

## VII

Finally, the defendant contends that the court erred in denying his post trial motion for a new trial as a result of juror misconduct occurring during the course of the trial. As found by the court, on May 3, 1978, at a luncheon recess, a conversation took place in the main lobby of the courthouse between the defendant and one of the jurors sitting on the case. The juror began the conversation with the defendant by asking him if the other jurors had come back yet. After the defendant replied "No," the juror commented about the weather and then said: "It looks like it's going to be a long trial." The defendant responded by saying "You have to go through a lot to prove what happened or to prove an accident." The juror then asked the defendant about his belief in God, to which the defendant stated that he felt that God had let him down. Finally, in response to a question posed by the juror about the victim in the case, the defendant volunteered the information that he had written a letter to the victim's mother in which he stated the victim's death was an accident and that he was sorry. The conversation then terminated when the defendant observed a sheriff approaching down a corridor heading to the main lobby.

This conversation was observed by the defendant's father and a secretary employed by the defendant's trial counsel. The secretary did not overhear any of the conversation; the defendant's father only overheard a part of the conversation.

Later that day, the defendant told Thomas Flood, a licensed private investigator who was employed by and who assisted the defendant's trial counsel during the trial, about the incident. Flood told the defendant to tell his trial counsel about the conversation with the juror. The defendant had also previously been instructed by his trial counsel not to talk to anybody during the trial.

The defendant knew he was not following his trial counsel's instructions when he talked to the juror. Yet, he did not tell his trial counsel of his conversation because he knew the conversation was improper[11] and was therefore afraid of his trial counsel's response.

After the unfavorable verdict was reached, the defendant informed his trial counsel of the conversation. His counsel then moved for a new trial, and a hearing was held on the issue. The court refused to grant the defendant a new trial ruling, inter alia, that there was no showing of any violation of the defendant's constitutional right to an impartial jury.

The defendant argues, on several grounds,[12] that the court erred in refusing to grant the defendant's motion for a new trial. We do not agree. "Where alleged juror misconduct claimed as prejudicial is

---

[11] The defendant's father, on the day of said conversation, said to the defendant, "You know you're not suppose to talk to a juror."

[12] Our disposition of this issue does not require us to reach all of the claimed bases of error.

known by the party *or* his counsel prior to rendition of a verdict, and no objection is made, nor the matter brought to the court's attention, the party cannot later assert the misconduct as grounds for a new trial." (Emphasis added.) *State* v. *Porter, Green & Smith,* 228 Kan. 345, 353, 615 P.2d 146 (1980), quoting *State* v. *Buggs,* 219 Kan. 203, 547 P.2d 720 (1976). "[W]here misconduct of jurors is first presented in the motion for new trial, an affirmative showing must be made that *both* defendant and his attorney were ignorant of the misconduct until after the trial. . . . The reason for the rule is that a defendant is not entitled to wait until the verdict is in, gambling on a favorable verdict, then seek a new trial if a verdict of guilty is returned. . . . Appellant's knowledge of the alleged misconduct prior to the conclusion of trial prevents its consideration when raised for the first time in the motion for new trial, even though appellant's counsel did not learn of it until after trial." (Emphasis added.) *State* v. *Brown,* 599 S.W.2d 498, 502 (Mo. 1980).

We do not agree with the defendant's contention that he was deprived of his right to the effective assistance of counsel. The defendant was told by his counsel not to talk to any juror during the trial; he knew that the conversation was improper; and, even though he was told by Mr. Flood to inform his counsel of the conversation, the defendant did not tell his attorney until after the verdict was reached.

We note that at the time of the conversation, there were two alternate jurors sitting on the defendant's jury, in addition to the twelve regular jurors. In an unattacked conclusion, the court stated that "[a]ny prejudice arising from said con-

versation could have been remedied by the trial court's excusing [the involved juror] from further service as a juror on the defendant's case and replacing [him] with one of the alternate jurors."

Under the circumstances of the case, because the defendant knew of the improper communication with the juror, yet waited until after an unfavorable verdict was reached to raise the issue, we decline to find error.

There is no error.

In this opinion the other judges concurred.