STATE OF CONNECTICUT *v.* KENNETH HADDAD
(10934)

SPEZIALE, C. J., PETERS, HEALEY, SHEA and GRILLO, Js.

Argued December 8, 1982—decision released March 1, 1983

*F. Mac Buckley,* for the appellant (defendant).

*Katherine J. Lambert,* deputy assistant state's attorney, with whom, on the brief, was *Harry S. Gaucher, Jr.,* state's attorney, for the appellee (state).

ARTHUR H. HEALEY, J.  The defendant Kenneth Haddad was charged in a two count information in which the first count charged him with intentionally aiding Arthur Faunce and Michael Zierler in committing the crime of burglary in the first degree in violation of General Statutes §§ 53a-8[1] and 53a-101 (a) (2)[2] and the second count charged him with intentionally aiding Arthur Faunce and Michael Zierler in committing the crime of attempted

---

[1] General Statutes § 53a-8 provides: "A person, acting with the mental state required for commission of an offense, who solicits, requests, commands, importunes or intentionally aids another person to engage in conduct which constitutes an offense shall be criminally liable for such conduct and may be prosecuted and punished as if he were the principal offender."

[2] General Statutes § 53a-101 (a) (2) provides: "(a) A person is guilty of burglary in the first degree when he enters or remains unlawfully in a building with intent to commit a crime therein and . . . (2) in the course of committing the offense, he intentionally, knowingly or recklessly inflicts or attempts to inflict bodily injury on anyone."

larceny in the first degree in violation of General Statutes §§ 53a-8, 53a-49, 53a-119 and 53a-122 (a) (2). After a trial to the court, *Dannehy, J.,* he was found guilty on the first count and the trial court granted the defendant's motion to dismiss the second count.[3] Thereafter, the defendant appealed from the judgment on the first count.

On appeal the defendant's basic claim is that the court could not have concluded, on the evidence and the reasonable inferences to be drawn from it, that his guilt had been established beyond a reasonable doubt. In challenging the sufficiency of the evidence to justify his conviction, he recognizes that on review the evidence must be given the construction most favorable to sustain the trial court's judgment of guilty. He maintains, however, that the state did not sustain its burden of proving beyond a reasonable doubt every essential element of the crime. He claims that "the key element . . . was whether Haddad intentionally aided Faunce and Zierler as it was conceded [that] both co-defendants had committed the crime."[4] Acknowledging that the court

---

[3] The second count of the information alleged that the value of the coin collection that was the subject of the attempted larceny was "between $2000 and $10,000." After the state rested, the state conceded that "there is no evidence that the value [of the coin collection] is over two thousand dollars."

After the state had rested and before the defendant put on his evidence, the defendant moved not only to dismiss the second count of the information, but also moved for a judgment of acquittal on both charges. The court, at that point, denied his motion for judgment of acquittal on the first count and reserved decision on that motion as to the second count. After both parties had rested, the court denied the motion for judgment of acquittal on the first count and granted the defendant's motion to dismiss, which was made at that time, as to the second count.

[4] After the state rested, in a colloquy between court and counsel the court said: "They—the State, I think, has proved [burglary in the first degree] by evidence beyond a reasonable doubt, each

had concluded that he had intentionally aided them by acting affirmatively in the furtherance of the crime, he submits that this court "should review again the credibility of these witnesses on this point," although he concedes that "ordinarily" rulings on the credibility of witnesses are not reviewed by us. Additionally, he claims that not only were Faunce and Zierler self-confessed and convicted accomplices[5] but their credibility was also gravely flawed by their trial testimony in the light of earlier statements each had given to the state police as developed particularly on cross-examination.[6] While arguing that his "testimony was not shaken in any material [way] by the state's cross-examination" and was "as believable as that of Faunce and Zierler," he goes on to claim that "the truthfulness of their testimony did not rise to the level of proof beyond a reasonable doubt by any reasonable assessment."

On the other hand, the state argues that there was sufficient evidence before the court to sustain its conclusion that the defendant was proven guilty beyond a reasonable doubt. Specifically, it maintains this was so with reference to the requisite mental intent for the charge of aiding the co-defend-

---

element of the crime." Defense counsel replied: "I think so." Defense counsel insisted that the state had not established the defendant's guilt as charged in the first count.

[5] Both Faunce and Zierler had pleaded guilty to their participation in the crime charged against the defendants and had been sentenced prior to their testimony at the defendant's trial.

[6] He also maintains that both Faunce and Zierler admitted on cross-examination that they knew the defendant had implicated them before they gave their statements to the state police. These three men gave their statements in the following temporal context: Haddad, Faunce and Zierler. Haddad implicated both, Faunce implicated Haddad and Zierler and Zierler implicated Haddad and Faunce.

ants in the underlying crime of burglary in the first degree, pointing to the right to prove intent by circumstantial evidence. Conceding that it depended heavily upon accomplice testimony which at times was "differing," it claims, nevertheless, that the credibility of all the testimony was a matter for the trial court to determine. It submits that the evidence was such that "the testimony of each accomplice independently supported the trial court's finding of guilty." Noting that the trial court explicitly adverted to the "inherent unreliability" of accomplice testimony and to the demeanor and attitude of the witnesses, it claims that there was sufficient evidence to warrant the trial court's finding that the state had proven the defendant guilty beyond a reasonable doubt.

At this point certain principles should be set out: "We have repeatedly stated the test which this court employs to determine whether the evidence is sufficient to sustain a verdict: ' "[T]he issue is whether the [trier] could have reasonably concluded, upon the facts established and the reasonable inferences drawn therefrom, that the cumulative effect of the evidence was sufficient to justify the verdict of guilty beyond a reasonable doubt . . . ." ' *State* v. *Gaynor,* 182 Conn. 501, 503, 438 A.2d 479 (1980), quoting *State* v. *Festo,* 181 Conn. 254, 259, 435 A.2d 38 (1980); *State* v. *Nemeth,* 182 Conn. 403, 410, 438 A.2d 120 (1980); *State* v. *Saracino,* 178 Conn. 416, 419, 423 A.2d 102 (1979); *State* v. *Jackson,* 176 Conn. 257, 262, 407 A.2d 948 (1978). 'In ruling on such a motion, the evidence presented at the trial must be given a construction most favorable to sustaining the jury's verdict.' *State* v. *Jackson,* supra, 262; see *State* v. *Nemeth,* supra; *State* v. *Chetcuti,* 173 Conn. 165, 172, 377 A.2d 263 (1977). Each

essential element of the crime charged. must be established by proof beyond a reasonable doubt, ' "and although 'it is within the province of the [trier] to draw reasonable, logical inferences from the facts proven, [it] may not resort to speculation and conjecture." ' *State* v. *Gaynor,* supra, 503; *State* v. *Festo,* supra, 259." *State* v. *Stankowski,* 184 Conn. 121, 126, 439 A.2d 918, cert. denied, 454 U.S. 1052, 102 S. Ct. 596, 70 L. Ed. 2d 588 (1981).[7] Where it cannot be said that a rational trier of fact could find guilt proven beyond a reasonable doubt, then, a conviction cannot "constitutionally stand," as it is violative of due process under the fourteenth amendment. *Jackson* v. *Virginia,* 443 U.S. 307, 317–18, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979); *State* v. *Kish,* 186 Conn. 757, 768, 443 A.2d 1274 (1982). The defendant, "by his plea of not guilty, put in issue every essential element of the crime charged. *Roe* v. *United States,* 287 F.2d 435 (5th Cir.), cert. denied, 368 U.S. 824, 82 S. Ct. 43, 7 L. Ed. 2d 29 [1961]; 21 Am. Jur. 2d, Criminal Law, § 467; 22 C.J.S., Criminal Law, § 454. With that, the burden rested upon the prosecution to prove the guilt of the accused, i.e., to prove each material element of the offense charged beyond a reasonable doubt. *Mullaney* v. *Wilbur,* 421 U.S. 684, 95 S. Ct. 1881, 44 L. Ed. 2d 508 [1975]; *State* v. *Johnson,* 162 Conn. 215, 231, 292 A.2d 903 [1972]; *State* v. *Jenkins,* 158 Conn. 149, 154, 256 A.2d 223 [1969]; 1 Wharton, Criminal Evidence (13th Ed.) § 10. The United States Supreme Court has

---

[7] In *State* v. *Stankowski,* 184 Conn. 121, 439 A.2d 918 (1981), we were reviewing, inter alia, the trial court's denial of the defendant's motion for judgment of acquittal where he contended that the state had failed to meet its burden of proving beyond a reasonable doubt every element of the crime charged and specifically that of intent.

explicitly held that the due process clause requires that every fact necessary to constitute the crime of which an accused stands charged must be proven beyond a reasonable doubt before a conviction. *In re Winship,* 397 U.S. 358, 364, 90 S. Ct. 1068, 25 L. Ed. 2d 368 [1970]." *State* v. *Griffin,* 175 Conn. 155, 162, 397 A.2d 89 (1978); see *State* v. *Mason,* 186 Conn. 574, 585, 442 A.2d 1335 (1982).

"The trier of the facts determines with finality the credibility of witnesses and the weight to be accorded their testimony. 'We cannot retry the facts or pass upon the credibility of the witnesses.' *Johnson* v. *Flammia,* 169 Conn. 491, 497, 363 A.2d 1048 (1975)." *State* v. *Penland,* 174 Conn. 153, 157–58, 384 A.2d 356, cert. denied, 436 U.S. 906, 98 S. Ct. 2237, 56 L. Ed. 2d 404 (1978). "The trial court is the final judge of credibility and may disbelieve a witness as to part of his or her testimony and accept it in other respects." *State* v. *Coulombe,* 143 Conn. 604, 608, 124 A.2d 518 (1956); see *Raia* v. *Topehius,* 165 Conn. 231, 235, 332 A.2d 93 (1973); *State* v. *Chisolm,* 162 Conn. 631, 632, 295 A.2d 563 (1972); *Rood* v. *Russo,* 161 Conn. 1, 3, 283 A.2d 220 (1971). The fact that the defendant's testimony contradicted that of Faunce and Zierler does not compel us to accept the argument that the evidence was insufficient to prove guilt beyond a reasonable doubt. *State* v. *Farrah,* 161 Conn. 43, 48–49, 282 A.2d 879 (1971). Special caution should be exercised by the trier of fact in passing upon the testimony of an accomplice because, as we said in *State* v. *Carey,* 76 Conn. 342, 349, 56 A. 632 (1904), "[t]he conditions of character and interest most inconsistent with a credible witness, very frequently, but not always, attend an accomplice when he testifies." See *State* v. *Ferrara,* 176 Conn. 508, 511, 408 A.2d

265 (1979); *State* v. *Colton,* 174 Conn. 135, 140, 384 A.2d 343 (1977). It is the trier's function not only to decide credibility but also to determine the facts and from those facts draw logical and reasonable inferences. *State* v. *Wilson,* 178 Conn. 427, 434, 423 A.2d 72 (1979); *State* v. *Ortiz,* 169 Conn. 642, 646, 363 A.2d 1091 (1975). We also note, as we have often said, that there is no legal distinction between direct and circumstantial evidence so far as probative force is concerned. See, e.g., *State* v. *Wilson,* supra; *State* v. *Brown,* 169 Conn. 692, 695, 364 A.2d 186 (1975); *State* v. *Cari,* 163 Conn. 174, 179, 303 A.2d 7 (1972).

There was evidence from which the court could have found the following facts:[8] In August and September, 1980, the defendant, by his own admission, owed roughly $100,000 to family members, friends and lending institutions. These obligations stemmed from his gambling losses, certain drug dealing with Faunce and his use of cocaine. Albert Faunce, whom he had known for about a year, was one of the persons to whom he owed money. Faunce had lent him $3000 in July, 1980, in connection with a gambling debt. Because he had difficulty collecting this money from the defendant, Faunce arranged with a drug supplier to "front" $3300 worth of cocaine which Faunce gave to the defendant. Under their arrangement, the defendant agreed to sell the cocaine at a profit and to return

[8] Although the defendant has conceded that the state had proven that Faunce and Zierler had committed the crime of burglary in the first degree, it is necessary to set out the circumstances under which the trial court could find that the state had proven the defendant guilty beyond a reasonable doubt of the crime charged in the first court of the information. In questioning the sufficiency of the evidence the defendant has recounted the evidence in twenty-one pages of his brief while the state's counterstatement covers nine pages of its brief.

$6300 of the proceeds to Faunce. This sum would include the $3300 owed to the supplier by Faunce and the $3000 the defendant owed Faunce. Haddad himself admitted he owed Faunce $3300 for cocaine. As evidence of their deal, the defendant signed a note[9] on August 5, 1980, that he owed Faunce $3350[10] for drugs as well as stating that if Haddad did not pay the debt by midnight of August 7, 1980, Faunce then could present the note to the defendant's mother for payment. Along with this note, Haddad gave Faunce eight postdated checks totaling $3350, but on August 7, the defendant substituted six checks for the original eight, which he destroyed.

On August 9, 1980, Haddad had still not paid Faunce and begged him not to contact his mother. The defendant, at about that time, told Faunce "he would come up with something, a better idea" regarding payment. Thereafter, around the latter part of August, the cocaine supplier was getting upset with Faunce over nonpayment and caused him to be threatened at gunpoint. Faunce was also informed that the supplier was looking for the defendant. After Faunce told Haddad this about the end of August, Haddad said "he could come up with a way that we could get full payment to these people."

About this time, the defendant told both Faunce and Zierler[11] of his desire to get money to settle

---

[9] This note was a full exhibit at the trial.

[10] An examination of the transcript does not disclose why the note was for $3350, which was $50 more than the debt of $3300.

[11] Zierler had known the defendant from the time Zierler had been four or five years of age, although not on an intimate basis. In August and September, 1980, he began to spend more time with Haddad, when, because of Zierler's friendship with Faunce of three or four years standing, the three of them went out together on a number of occasions.

various debts he had. Haddad told[12] Faunce and Zierler that he knew a man named Danny Greene who was a collector of antiques and coins and who had a valuable collection of coins. Haddad suggested it would be very possible to steal the coin collection. Several years earlier when Greene lived over a pizza restaurant in Willimantic, he had shown the defendant coin collections in his possession which were owned by Greene and two other persons. Haddad told Faunce and Zierler that he had seen the coin collection when it was usually kept inside a "bureau"[13] where Greene lived over the pizza restaurant. The defendant also said that "it could be valued anywhere between two thousand and ten thousand dollars."

After this conversation and while Haddad, Faunce and Zierler were passing through Willimantic, Haddad had Zierler pull his car over in front of the pizza restaurant. The defendant asked some people who were there and who were mutual friends of Greene and the defendant where Greene had moved to. He learned from them that Greene now lived on Lisbon Road in Canterbury. They drove to Canterbury and located Greene's house. The only decision made in regard to the coin collection and the Greene residence that night was that Haddad suggested he would do "some research into it" by going over to Greene's house, talking with him and trying to get a layout of his house or apartment.

On the afternoon of September 29, 1980, the defendant went alone to the house on Lisbon Road in Canterbury where Danny Greene resided with

---

[12] This conversation with Faunce took place in Zierler's presence when all three were out socializing.

[13] During the trial the words "bureau" and "buffet" were used interchangeably.

Ruth Guyette and the latter's daughter, Donna Carey. Both Greene and Guyette, who were there at that time, knew the defendant although they had not seen him for about a couple of years. About three years before Haddad had sold Greene a piece of antique furniture. Aware of Greene's interest in fixing up and refinishing antiques, the defendant asked him if he was interested in buying some antiques or furniture. During this conversation inside the house, both Greene and Guyette observed that the defendant kept "walking around" and "looking around" in the kitchen, living room and dining room areas. Although Greene did not have at his house on Lisbon Road the same buffet he had when he lived over the pizza restaurant, he did have "one almost like it . . . very similar." The defendant's visit lasted "roughly a half an hour," and when it ended Haddad told Greene he would call him in a couple of weeks.

On the evening of September 29, 1980, Haddad telephoned Faunce and asked if he wanted to go out for "a few drinks or ride around." Faunce declined. Very shortly thereafter, Zierler telephoned Faunce and told him he was coming down to see Faunce. Thereupon, Faunce told Zierler to pick up Haddad and the three would meet at a market in Canterbury. Zierler, who had been drinking, picked up the defendant in Willimantic. During the trip to meet Faunce, the defendant mentioned that he was in dire need of funds to pay various debts, one of which was owing to Faunce; the defendant said that he was a "desperate man." He also said that he had visited Greene's house earlier that day; and in addition he spoke of "trying to gain access to Mr. Greene's coin collection, stealing it that night." They did meet Faunce at approximately ten o'clock

at the market in Canterbury and all three got into Zierler's car which he was driving. Haddad knew Faunce had a .22 revolver and a can of mace when Faunce got into Zierler's car.[14] Faunce had the gun in his hand when he went into Zierler's car.

They drove by Greene's house and the defendant told them that he had been there earlier that day, talked with Danny Greene and knew that he was still dealing in old coins. He then presented them with a sketch map[15] he had made of the interior of Greene's house which both examined and he told them that this would be a "very good night" to steal the coin collection because Greene frequented the dog track. The defendant further told them that from his being there it was his impression that whenever Greene was home he was always the one who answered the telephone and that if he could call the Greene residence and anybody but Greene answered he would be positive Greene was not home. The three thereupon returned to the market in Canterbury where the defendant exited the car, dialed a number on the pay phone, listened briefly, hung up the receiver, got back into the car and informed the other two that a woman's voice answered the phone.

They drove back to the area of the Greene residence and parked about one house past Greene's on the same side in a gravel lot[16] with the front of the car facing the road. It was decided that the defendant would not go with Faunce and Zierler into the

---

[14] Faunce kept the gun and the mace in his truck ever since the time he was threatened because he had not paid the cocaine supplier.

[15] Haddad designated in this sketch the approximate area where he believed the coins to be kept.

[16] This was approximately one hundred yards past Greene's residence.

house because he had been there earlier that day and both Guyette and Greene knew him. Haddad got into the driver's seat as he was to stay in the car with the motor running to be a lookout and the getaway driver if the other two were to return in a hurry.

While Faunce and Zierler were proceeding on foot toward the house, Faunce was carrying the revolver concealed in his trousers and a can of chemical shield (mace) in his shirt pocket. As they neared the door of the house, however, they decided not to pursue the plan. Instead, they knocked on the door which Guyette answered.[17] They asked if Danny was home; she said he was not but that he was at the dog track and would perhaps be home in about fifteen minutes. Faunce and Zierler then left after declining her invitation to stay and have coffee saying that they would come back later. At that time, Donna Carey and Gertrude Palmer, a neighbor, were also in the house.

Faunce and Zierler returned to the car where the defendant was in the driver's seat and told him that they had decided they did not want to go through with their plan to steal the coins. The three then drove around for a time with Zierler now driving. The defendant told them they should not have "chickened out," that they should have "went ahead and scared them, surprised them with the mace." He was "agitated"; he told them they should get "access to the coin collection because we needed to get it and that we had to do it that night." He again gave them cocaine.[18] He seemed "very intent

[17] Maybe ten or fifteen minutes before this, Donna Carey had answered the telephone and "nobody was on the other end."

[18] He gave Faunce and Zierler cocaine that night both before and after their first visit to Greene's residence.

in coercing us to do it" and, after maybe fifteen or twenty minutes, they decided they would go back to carry out their plan. Zierler, who was very intoxicated, was easy to convince and he told Faunce in the presence of the defendant that he would gladly spray the-mace if Faunce took the gun with him.[19] The defendant was to remain in the car at the same place as before to act as the driver and the other two men were to enter the house and seek to steal the coins as originally planned.

At about 10:30 p.m. Faunce and Zierler burst into the Greene residence and, on entering, Zierler sprayed the mace into the faces of Guyette and Palmer.[20] Palmer ran out of the house and Guyette, her face burning,[21] ran into her bedroom and ordered her daughter Donna, who was in bed, to lie on the floor. One of the men was trying to force open the bedroom door; Guyette succeeded finally in locking it. She heard the men walking around, opening doors and the like. She got a gun from a bureau in the bedroom and fired a shot into the floor. Faunce and Zierler, hearing the shot, ran out of the house and when they got to where the car was parked the defendant was gone. Guyette and her daughter exited the house through the bedroom window. In the process of opening the bedroom window, Guyette dropped the gun and it went off again with the shot going through the window. Once outside, she fired two or three more shots in the air. Upon returning to the house, they did not notice

---

[19] When the two men entered the house the second time, Zierler brought the mace. Faunce, however, did not bring his gun but "slid the revolver under the front seat of the car."

[20] Danny Greene had still not returned home at this time.

[21] Guyette said: "It burned my face, really burned, you know." "I got it . . . all over my face . . . . Burned real bad."

anything missing but Guyette saw that the doors and drawers of her buffet were opened whereas before this episode they were closed and "everything in it."

When he heard the shots, the defendant left the car and stopped at the home of the witnesses Dustin Nattress and Elizabeth Nattress who were neighbors and lived near the Greene residence. He did not know these people, but asked to use their telephone to endeavor to get himself a ride telling the Nattresses that his car had broken down. At that time he appeared nervous and was perspiring. Apparently unsuccessful with his efforts on the telephone to get a ride, he asked Dustin Nattress for assistance but he was unwilling to help him.

After several attempts to contact Haddad, Faunce finally reached him about two weeks after the burglary. In response to Faunce's inquiry about where the defendant went that night, he told Faunce that when he heard the shots he ran to the Greene residence to see if anyone had been hurt and that Faunce and Zierler had driven off without him although he was yelling at them from the bushes to pick him up.

After learning that the state police had an arrest warrant for him, the defendant went to the state police barracks on November 10, 1980. Although he first said he had no idea what the charges stemmed from, he changed his position upon being shown a police sketch of a heel mark of a shoe made at the scene of the crime which was similar to that of a shoe he was actually wearing at that time.[22] In his

---

[22] This shoe was taken as evidence from the defendant at the police barracks on November 10, 1980.

statement he admitted being with Faunce and Zierler[23] at the scene that night but he placed all the blame for the break-in on them.

Not only is it conceded that the underlying crime of burglary in the first degree in violation of General Statutes § 53a-101 (a) (2) was committed, but also it is evident that the state proved it beyond a reasonable doubt. In its decision the trial court noted that credibility "is a critical issue in this case" and, in determining that issue, specifically noted that it had considered "by way of illustration and not limitation, the demeanor and attitude of the witnesses as they testified" and that it had "not overlooked the fact that Mr. Faunce and Mr. Zierler are self-confessed and convicted accomplices."

There was evidence, as we have set out, upon which the trial court could reasonably conclude, as it did, that the state had proven beyond a reasonable doubt that the defendant was guilty of the crime charged in the first count of the information. The state had to prove beyond a reasonable doubt that the defendant possessed the intent to commit the crime charged. The intent of the defendant is a question for the trier of fact and the trier's conclusion in this regard should stand unless it is unreasonable. *State* v. *Holley,* 174 Conn. 22, 26, 381 A.2d 539 (1977); see *State* v. *Ruiz,* 171 Conn. 264, 271, 368 A.2d 222 (1976). "This burden of proof on intent ordinarily can be borne only by the presentation of circumstantial evidence, because intention is a mental process that necessarily must be proved through inferences drawn from the

[23] The trooper assigned to the investigation testified that that was the first time that the name of either Faunce or Zierler had come up in the police investigation of this incident.

defendant's statements and actions. *State* v. *Holley,* 174 Conn. 22, 25–26, 381 A.2d 539 (1977); *State* v. *Cofone,* 164 Conn. 162, 164–65, 319 A.2d 381 (1972)." *State* v. *Harrison,* 178 Conn. 689, 695, 425 A.2d 111 (1979). "The accessory statute, § 53a-8, sets forth the element of intent as a twofold requirement: that the accessory have the intent to *aid* the principal *and* that in so aiding he intend to *commit* the offense with which he is charged. See LaFave & Scott, Criminal Law (1972), p. 505 n.53, § 64." (Emphasis in original.) *State* v. *Harrison,* supra, 694. "A person acts 'intentionally' with respect to a result or to conduct described by a statute defining an offense when his conscious objective is to cause such result or to engage in such conduct." General Statutes § 53a-3 (11); see *State* v. *Ruiz,* supra. The defendant not only instigated and devised the plan to break into the Greene residence, for which he solicited the enlistment of Faunce and Zierler, but he also managed and implemented it. When his two confederates weakened in their resolve after their first visit, he overbore their reluctance and pressed them to go into the Greene residence again to carry out the plan. His conscious objective throughout the entire continuum of circumstances of the plan was not only to gain entry to the Greene residence and to steal the coins but also to accomplish this objective by having Zierler spray mace on the occupants. He shared the requisite criminality of intent and the community of unlawful purpose of his confederates. *State* v. *Teart,* 170 Conn. 332, 336, 365 A.2d 1200 (1976). He was not passively acquiescent nor acting innocently. See *State* v. *Teart,* supra; *State* v. *Laffin,* 155 Conn. 531, 536, 235 A.2d 650 (1967); *State* v. *Pundy,* 147 Conn. 7, 11, 156 A.2d 193 (1959). He knew Faunce had brought a

revolver[24] and mace with him, he knew the condition of both men when they left to go in the second time, he suggested that the mace be used and he knew of their intended course of action when they went into the house again. He did nothing at all to deter them. The fact that the defendant did not go into the house with Faunce and Zierler in no way precludes sustaining his conviction. This is so because it is not necessary to support a conviction under the accessory statute in § 53a-8 "to prove that an accused was actually present at or actively participated in the actual commission of a crime. It is sufficient to prove that he intentionally assisted in its commission. *State* v. *Pundy,* 147 Conn. 7, 156 A.2d 193 [1959]." *State* v. *Hicks,* 169 Conn. 581, 585, 363 A.2d 1081 (1975). The defendant "intentionally" aided Faunce and Zierler and, in aiding them, he intended to commit the offense with which he was charged. Moreover, both Guyette and Palmer were in fact "maced" inside the house. The state fully sustained its burden of proof and the trial court could have reasonably found as it did.

There is no error.

In this opinion the other judges concurred.

---

[24] It is not clear from the transcript whether the defendant actually knew that Faunce had left the revolver under the seat in the car the second time they entered the house.