******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

STATE OF CONNECTICUT *v.* KELLY ANN DANFORTH
(SC 19243)

Rogers, C. J., and Palmer, Zarella, Eveleigh, McDonald,
Espinosa and Robinson, Js.

*Argued February 10, 2014—officially released February 10, 2015*

*Annacarina Jacob*, senior assistant public defender, with whom, on the brief, was *James B. Streeto*, assistant public defender, for the appellant (defendant).

*Kathryn W. Bare*, assistant state's attorney, with whom, on the brief, were *Matthew C. Gedansky*, state's attorney, and *Andrew Reed Durham*, assistant state's attorney, for the appellee (state).

*Opinion*

PALMER, J. A jury found the defendant, Kelly Ann Danforth, guilty of robbery in the first degree as an accessory in violation of General Statutes §§ 53a-134 (a) (4)[1] and 53a-8 (a),[2] and conspiracy to commit robbery in the first degree in violation of General Statutes §§ 53a-134 (a) (4) and 53a-48 (a).[3] Because the jury further found that a firearm had been used in the commission of the robbery, the trial court concluded that the defendant was subject to a sentence enhancement under General Statutes § 53-202k,[4] which provides for the mandatory imposition of a consecutive five year term of imprisonment when a person uses, or is armed with and threatens to use, a firearm in the commission of a class A, B or C felony.[5] The trial court rendered judgment in accordance with the jury verdict and finding, and sentenced the defendant to a total effective term of imprisonment of six years.[6] On appeal,[7] the defendant claims that (1) the evidence was insufficient to support her conviction of robbery in the first degree as an accessory and conspiracy to commit robbery in the first degree, (2) she was not subject to sentence enhancement under § 53-202k because that provision should be construed to apply only to persons who either use a firearm in the commission of the offense or intend that another participant in the offense do so,[8] and because it is undisputed that the defendant was unarmed when the robbery occurred and the jury was not asked to decide whether she intended that a firearm be used in the robbery, and (3) the trial court improperly instructed the jury regarding the state's burden of proof. We reject the defendant's claims and, accordingly, affirm the judgment of the trial court.

The jury reasonably could have found the following facts. In October, 2010, the defendant, her boyfriend, Anthony Flemke, and their mutual friend, Chadwick Matzdorff, resided together in an apartment in the town of Lebanon. On October 19, 2010, the defendant learned that Charissa McDonald, from whom she frequently purchased prescription drugs, including Percocet, illegally, was in possession of a large quantity of such drugs. The defendant proposed to Flemke and Matzdorff that they rob McDonald of the drugs, and, together, they devised a plan for doing so. Specifically, they agreed that the defendant would arrange to meet McDonald later that evening in the parking lot of a gas station in the town of Bolton, ostensibly for the purpose of purchasing ten Percocet pills from her. Because McDonald knew both the defendant and Flemke, they decided that Matzdorff should carry out the robbery and that Flemke, using the defendant's car, would serve as Matzdorff's driver. The plan called for Flemke to drive Matzdorff to the gas station where the defendant and McDonald had agreed to meet. The defendant would wait at home and Flemke would wait in a nearby

parking lot while Matzdorff carried out the robbery. Once the robbery was completed, the defendant would call McDonald's cell phone from her home telephone to establish an alibi for the whereabouts of the defendant, Flemke and Matzdorff during the robbery. While the defendant, Flemke and Matzdorff were planning the robbery, Flemke had provided Matzdorff with a ski mask and an airsoft pellet gun to use during the robbery.

In accordance with the plan, the defendant arranged to meet McDonald at the Bolton gas station where they usually met when the defendant purchased drugs from her. Flemke then drove Matzdorff to that location to wait for McDonald. When McDonald arrived at the gas station with her friend, Kelly D'Aprile, they saw that the station was closed and decided that it was unsafe to complete the transaction there. At that time, McDonald, who was sitting in the passenger seat, sent a text message to the defendant's cell phone, instructing the defendant to meet her at a 7-Eleven store in the town of Andover instead. Flemke, who had taken the defendant's cell phone with him, responded to the text message, pretending to be the defendant. Flemke informed McDonald that they would meet at the 7-Eleven store. Flemke then drove Matzdorff to that location. Once there, Matzdorff waited in the woods behind the store until all other customers had left the parking lot. He then ran up to McDonald's car, opened the driver's side door, pointed the gun at D'Aprile's head, and demanded that she give him "everything" she had. Before D'Aprile could respond, Matzdorff reached into the car, grabbed a purse from the backseat and ran off to meet up with Flemke. When Matzdorff got back to the car, he discovered that he had stolen D'Aprile's purse, which contained no drugs. As Flemke and Matzdorff drove home, Matzdorff called the defendant to inform her that the robbery was completed, and that she should call McDonald to establish their alibi. McDonald did not answer her phone at that time, however, because she was busy speaking to police officers who had responded to the robbery. The defendant eventually spoke with McDonald later that evening and informed her that she had gone to the 7-Eleven store as planned but did not stop because there were police cars in the parking lot.

When speaking to police on the night of the robbery, McDonald did not reveal that she was at the 7-Eleven store to sell prescription medication to the defendant. Over the next few days, however, she began to suspect that the defendant was involved in the robbery, and she ultimately told the police about the planned drug transaction. She also told the police that the perpetrator resembled Matzdorff, whom she previously had met through the defendant. After learning that McDonald had informed the police of her suspicions regarding the defendant and Matzdorff, Flemke and Matzdorff disposed of the gun. Matzdorff was eventually arrested and charged with the robbery, and he gave a statement

to the police confessing to the crime and implicating Flemke and the defendant as his accomplices.

The defendant thereafter was arrested and charged with robbery in the first degree as an accessory and conspiracy to commit robbery in the first degree. Additionally, the state sought a mandatory five year sentence enhancement pursuant to § 53-202k on the basis of Matzdorff's use of a firearm during the commission of the robbery, even though it was undisputed that the defendant was neither armed nor present at the scene of the robbery. Following a trial, a jury found the defendant guilty of both charges. After accepting the verdict, the court instructed the jury to answer the following interrogatory: "Has the state proven to all of you unanimously beyond a reasonable doubt, that the defendant was convicted of a class B felony and in the commission of such felony the perpetrator used or was armed with and threatened the use of, or displayed, or represented by her words or conduct that she possessed a firearm?" The jury answered the question in the affirmative. The trial court thereafter sentenced the defendant to a total effective term of imprisonment of six years, including a consecutive five year prison term under § 53-202k.[9] This appeal followed.

I

We first address the defendant's claim that the evidence was insufficient to support her conviction of robbery in the first degree as an accessory and conspiracy to commit robbery in the first degree. The defendant contends that the state failed to adduce sufficient evidence to establish that (1) she intentionally aided Matzdorff and Flemke in the commission of the robbery, which was required to support her conviction of robbery in the first degree as an accessory, and (2) she intended that Matzdorff would use a firearm in the commission of the robbery, which was required to support her conviction of conspiracy to commit robbery in the first degree. We reject both contentions.[10]

The following additional facts and procedural history are relevant to our analysis of these claims. At trial, the state relied principally on the testimony of Matzdorff and, to a lesser extent, the testimony of McDonald, to prove its case against the defendant. Matzdorff testified that, on the day of the robbery, the defendant and Flemke had told him that McDonald was in possession of a significant quantity of prescription drugs and that the defendant wanted to rob McDonald of them. Matzdorff further testified that the defendant called McDonald to arrange to meet her at a local gas station so that the defendant could purchase some of the drugs. Matzdorff also testified that, while they were working out the details of the robbery, Flemke went to the bedroom that he shared with the defendant and retrieved a ski mask and an airsoft pellet gun for Matzdorff to use during the robbery. According to Matzdorff, the

defendant told him that he "had to be the one to do it [because] Flemke was too much of a bitch. He wouldn't do it—he'd punk out." Matzdorff further testified that they all agreed that he "was the only one [who] could really do it" because McDonald knew both the defendant and Flemke, and would recognize them. Matzdorff also testified that, immediately after the robbery, he called the defendant from the car and told her to call McDonald to establish their alibi. Specifically, Matzdorff instructed the defendant to tell McDonald that she had driven by the 7-Eleven store but "saw the cops there. That's why [she] didn't stop." Finally, Matzdorff testified that, when he and Flemke arrived home after the robbery, he entertained the defendant and Flemke by describing the terrified looks on McDonald's and D'Aprile's faces when he pointed the gun at D'Aprile's head. According to Matzdorff, "[they] all [kind of] laughed about it."

McDonald confirmed much of Matzdorff's testimony, explaining that, on the day of the robbery, the defendant had called her to arrange to meet at a local gas station so that the defendant could purchase drugs from her. McDonald also confirmed that, shortly after the robbery, the defendant called her and told her that she had driven by the 7-Eleven store but did not stop because of the police presence in the parking lot. The state also presented cell phone records from the night of the robbery, which corroborated Matzdorff's and McDonald's testimony regarding the timing of the calls and text messages between the defendant's cell phone and McDonald's cell phone.

"We review a claim of evidentiary insufficiency by applying a two-part test. First, we construe the evidence in the light most favorable to sustaining the verdict. Second, we determine whether upon the facts so construed and the inferences reasonably drawn therefrom the [finder of fact] reasonably could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt. . . . [I]n viewing evidence which could yield contrary inferences, the jury is not barred from drawing those inferences consistent with guilt and is not required to draw only those inferences consistent with innocence. The rule is that the jury's function is to draw whatever inferences from the evidence or facts established by the evidence it deems to be reasonable and logical." (Internal quotation marks omitted.) *State* v. *Fourtin*, 307 Conn. 186, 197–98, 52 A.3d 674 (2012).

Additionally, "proof beyond a reasonable doubt does not mean proof beyond all possible doubt . . . nor does proof beyond a reasonable doubt require acceptance of every hypothesis of innocence posed by the defendant that, had it been found credible by the [jury], would have resulted in an acquittal. . . . On appeal, we do not ask whether there is a reasonable view of the

evidence that would support a reasonable hypothesis of innocence. We ask, instead, whether there is a reasonable view of the evidence that supports the jury's verdict of guilty. . . . Thus, [w]e do not sit as a thirteenth juror who may cast a vote against the verdict based [on] our feeling that some doubt of guilt is shown by the cold printed record. . . . Rather, we must defer to the jury's assessment of the credibility of the witnesses based on its firsthand observation of their conduct, demeanor and attitude." (Citation omitted; internal quotation marks omitted.) *State* v. *Patterson*, 276 Conn. 452, 461, 886 A.2d 777 (2005).

A

We first address the defendant's claim that the evidence was insufficient to support her conviction of robbery in the first degree as an accessory because the state failed to prove that she intentionally aided Matzdorff and Flemke in the commission of that offense. The defendant argues that the evidence was insufficient to establish that she assisted in the commission of the robbery because, although there was proof that she initially had arranged to meet McDonald at the gas station, it was undisputed that Flemke arranged to meet McDonald at the 7-Eleven store after McDonald chose not to stop at the gas station in Bolton. The defendant further contends that her telephone call to McDonald following the robbery, to explain why she had not stopped at the 7-Eleven store, did not aid in the commission of the offense because the crime had been committed before she made that call.

To establish the defendant's guilt with respect to the offense of robbery in the first degree as an accessory under §§ 53a-134 (a) (4) and 53a-8 (a), the state was required to prove: (1) that a robbery in the first degree was committed; see General Statutes §§ 53a-133 and 53a-134; (2) that the defendant had the intent to commit the robbery; see, e.g., *State* v. *Avila*, 223 Conn. 595, 603–604, 613 A.2d 731 (1992); and (3) that the defendant "solicit[ed], request[ed], command[ed], importune[ed] or intentionally aid[ed]" in the commission of the offense.[11] General Statutes § 53a-8 (a). "[A] conviction under § 53a-8 requires [the state to prove the defendant's] dual intent, [first], that the accessory have the intent to aid the principal and [second] that in so aiding he intend to commit the offense with which he is charged." (Emphasis omitted; internal quotation marks omitted.) *State* v. *Foster*, 202 Conn. 520, 525–26, 522 A.2d 277 (1987). "This is because accessorial liability is designed to punish one who intentionally aids another in the commission of a crime and not one whose innocent acts in fact aid one who commits an offense. . . . Mere presence as an inactive companion, passive acquiescence, or the doing of innocent acts which may in fact aid the one who commits the crime must be distinguished from the criminal intent and community of

unlawful purpose [that is] shared by one who knowingly and wilfully assists the perpetrator of the offense in the acts which prepare for, facilitate or consummate it." (Internal quotation marks omitted.) *State* v. *Gonzalez*, 311 Conn. 408, 421, 87 A.3d 1101 (2014).

We agree with the state that the evidence amply supported the jury's finding that the defendant solicited Matzdorff to commit the robbery, and that she intentionally aided in the commission of the offense by arranging to meet McDonald at a gas station, by allowing Matzdorff and Flemke to use her car to drive to that location, and by allowing Flemke to use her cell phone at or around the time of the robbery. Indeed, according to Matzdorff, the defendant hatched the plan to rob McDonald and proposed that Matzdorff carry it out. All of this evidence, if credited by the jury, was more than sufficient to support a finding that the defendant solicited Matzdorff to commit the robbery and wilfully assisted him in carrying it out. See, e.g., *State* v. *Harris*, 32 Conn. App. 831, 841, 632 A.2d 50 (1993) (" 'solicits, requests, commands, importunes or intentionally aids' requires only an asking or insistence that an act be done"), appeal dismissed, 230 Conn. 347, 644 A.2d 911 (1994). The defendant's argument that she did not aid in the robbery because it was Flemke, posing as her, who arranged to meet McDonald at the 7-Eleven store after McDonald chose not to stop at the gas station in Bolton, ignores the fact that McDonald would not have been in contact with Flemke in the first place if the defendant had not lured McDonald to the gas station and given Flemke her cell phone so that he could communicate with McDonald while pretending to be the defendant. See *State* v. *Haddad*, 189 Conn. 383, 399–400, 456 A.2d 316 (1983) (there was sufficient evidence to support defendant's conviction of burglary and attempt to commit larceny as accessory even though defendant was not present during commission of offenses, when evidence established that he devised plan, solicited perpetrators to carry out offenses, and encouraged them to proceed with plan); *State* v. *Conde*, 67 Conn. App. 474, 476–77, 487–89, 787 A.2d 571 (2001) (evidence that gang leader created conditions to facilitate murder by approving killing and ensuring that certain gang members would not retaliate was sufficient to support conviction for murder as accessory), cert. denied, 259 Conn. 927, 793 A.2d 251 (2002). There is no merit to the defendant's contention that the evidence was insufficient to support her conviction of robbery in the first degree as an accessory.

B

We next consider the defendant's contention that the evidence was insufficient to support her conviction of conspiracy to commit robbery in the first degree. The defendant argues that, in order to establish her guilt with respect to that crime, the state was required to

prove that she had the specific intent to bring about all of the elements of the underlying offense, including that she intended for Matzdorff to use a firearm during the robbery. See General Statutes § 53a-134 (a) (4). The defendant further contends that the evidence was insufficient to support such a finding because Matzdorff did not testify that the defendant was present when Flemke handed him the gun or that she acquiesced in Matzdorff's use of the gun during the robbery.

"To establish the crime of conspiracy under § 53a-48 . . . it must be shown that an agreement was made between two or more persons to engage in conduct constituting a crime and that the agreement was followed by an overt act in furtherance of the conspiracy by any one of the conspirators. The state must also show intent on the part of the accused that conduct constituting a crime be performed." (Internal quotation marks omitted.) *State* v. *Booth*, 250 Conn. 611, 657–58 737 A.2d 404 (1999), cert. denied sub nom. *Brown* v. *Connecticut*, 529 U.S. 1060, 120 S. Ct. 1568, 146 L. Ed. 2d 471 (2000). "Conspiracy is a specific intent crime, with the intent divided into two elements: (a) the intent to agree or conspire and (b) the intent to commit the offense which is the object of the conspiracy. . . . Thus, [p]roof of a conspiracy to commit a specific offense requires proof that the conspirators intended to bring about the elements of the conspired offense." (Citation omitted; internal quotation marks omitted.) *State* v. *Padua*, 273 Conn. 138, 167, 869 A.2d 192 (2005).

In the present case, the state alleged that the object of the conspiracy was robbery in the first degree in violation of § 53a-134 (a) (4), the elements of which require proof that a "participant in the crime . . . displays or threatens the use of what he represents by his words or conduct to be a pistol, revolver, rifle, shotgun, machine gun or other firearm . . . ." Thus, in order to establish that the defendant was guilty of the conspiracy charge, the state was required to prove that the defendant agreed that Matzdorff would use, display or threaten the use of a firearm during the robbery. See *State* v. *Pond*, 315 Conn. 451, 489, A.3d (2015) (to prove that defendant was guilty of conspiracy to commit second degree robbery, state was required to prove that defendant agreed that weapon would be used in commission of that offense). We previously have held that "the existence of a formal agreement between the conspirators need not be proved because [i]t is only in rare instances that conspiracy may be established by proof of an express agreement to unite to accomplish an unlawful purpose. . . . [T]he requisite agreement or confederation may be inferred from proof of the separate acts of the individuals accused as coconspirators and from the circumstances surrounding the commission of these acts. . . . Further, [c]onspiracy can seldom be proved by direct evidence. It may be inferred from the activities of the accused persons." (Internal

quotation marks omitted.) *State* v. *Millan*, 290 Conn. 816, 826, 966 A.2d 699 (2009). Finally, "[b]ecause direct evidence of the accused's state of mind is rarely available . . . intent is often inferred from conduct . . . and from the cumulative effect of the circumstantial evidence and the rational inferences drawn therefrom." (Internal quotation marks omitted.) *State* v. *Otto*, 305 Conn. 51, 66, 43 A.3d 629 (2012).

Construing the evidence in the light most favorable to the state, we conclude that it is readily apparent that the evidence supported a finding that the defendant intended for Matzdorff to use a firearm during the robbery. Although it is true, as the defendant argues, that Matzdorff did not expressly testify that the defendant was present at the precise moment when Flemke handed him the gun, it was reasonable to infer from Matzdorff's testimony that the defendant was present at that time and that, in any event, she knew full well that Matzdorff would use the gun to rob McDonald. For example, when the assistant state's attorney (prosecutor) asked Matzdorff whether there was any discussion as to how the robbery would be committed, he stated: "Yeah. There was a lot . . . of discussion about how we would do it to get away with it because, obviously, I didn't want to get caught [because] I would be the one [doing] most of the time for the crime." The prosecutor then asked Matzdorff: "And . . . were all three of you involved in this discussion, or only certain parties?" Matzdorff responded: "Yeah, all three of us. . . . [It] was a collective . . . agreement." The prosecutor also asked Matzdorff: "And, out of that discussion, did you come up with a plan?" Matzdorff responded: "Yes, we did." After Matzdorff generally described the plan, the prosecutor asked him, "[a]nd, how were you supposed to rob them?" Matzdorff responded: "I had [an] . . . airsoft pellet gun. . . . It was [Flemke's], I guess. . . . [He and the defendant] had pulled it out before, shot it a couple of times. But it wasn't something that was out all the time [because] we had a lot of young kids around the house all the time. . . . It was in their room." Matzdorff further explained that, while they were planning the robbery, Flemke had gone to the bedroom that he shared with the defendant to retrieve the gun, as well as a ski mask for Matzdorff to wear during the robbery. Finally, the fact that the defendant laughed as Matzdorff was recounting the terrified looks on McDonald's and D'Aprile's faces when he pointed the gun at D'Aprile's head is wholly consistent with her knowledge that the gun would be used.

We agree with the state that this testimony, combined with Matzdorff's testimony regarding the defendant's central role in planning the robbery, was more than sufficient to support a finding that the defendant was aware that a gun would be used to commit the offense. See, e.g., *State* v. *Millan*, supra, 290 Conn. 828–30 (there was sufficient evidence that agreement included use of

knife when coconspirators continued with assault after one of them pulled out knife); *State* v. *Crosswell*, 223 Conn. 243, 256, 612 A.2d 1174 (1992) (fact that defendant stood by silently when gun was displayed was sufficient to support finding that he agreed that gun would be used during robbery). Indeed, to conclude otherwise would effectively require the state to adduce testimony that each coconspirator expressly agreed to every act that was part of the conspiracy. Such a requirement, however, runs counter to well established principles of conspiracy law. Indeed, we repeatedly have recognized that, "[b]ecause of the secret nature of conspiracies, a [conspiracy] conviction usually is based on circumstantial evidence. . . . Consequently, it is not necessary to establish that the defendant and his coconspirators signed papers, shook hands, or uttered the words we have an agreement. . . . [T]he requisite agreement or confederation may be inferred from proof of the separate acts of the individuals accused as coconspirators and from the circumstances surrounding the commission of these acts."[12] (Citation omitted; internal quotation marks omitted.) *State* v. *Patterson*, supra, 276 Conn. 462. Accordingly, we reject the defendant's claim that the jury reasonably could not have found that she intended that Matzdorff would use a gun to commit the robbery.

II

The defendant next claims that the trial court improperly concluded that she was subject to a sentence enhancement under § 53-202k. Specifically, the defendant claims that § 53-202k does not apply to unarmed accomplices and that, because it is undisputed that she was not armed during the commission of the robbery, she could not be subject to a sentence enhancement under § 53-202k. Although acknowledging that we rejected an identical claim in *State* v. *Davis*, 255 Conn. 782, 784, 792, 772 A.2d 559 (2001), the defendant contends that we should overrule our holding in that case. Alternatively, the defendant urges us to limit the holding in *Davis* to cases in which the jury is instructed that, to find an unarmed accomplice subject to sentence enhancement under § 53-202k, the state must prove that he or she intended that a firearm would be used by another participant in the underlying felony.

The defendant cannot prevail on this claim in light of our decision today in the companion case of *State* v. *Flemke*, 315 Conn. 500,      A.3d      (2015). In particular, in *Flemke*, we reaffirmed our conclusion in *Davis* that the language of § 53-202k, when read in light of the principles codified in the accessory statute, § 53a-8 (a), does not require proof that an accomplice actually used, displayed or threatened to use a firearm in the commission of a class A, B or C felony. See id., 511. We also declined to limit *Davis* as the defendant in the present case advocates because the reasoning on which

our holding in *Davis* was founded, namely, that an accomplice and principals are to be treated identically for all purposes, including sentence enhancement under § 53-202k, negates the contention that an unarmed accomplice is entitled to a jury finding that he intended that another participant in the robbery would use a firearm. See id., 515–17. Thus, in light of our decision in *Flemke*, the defendant cannot prevail on her claim under § 53-202k.

III

The defendant's final contention is that the trial court improperly instructed the jury concerning the state's burden of proof. Specifically, the defendant challenges three separate statements that the trial court made in explaining the meaning of reasonable doubt: (1) that a reasonable doubt is "a real doubt, an honest doubt"; (2) that a reasonable doubt is "such a doubt as, in the serious affairs that concern you, you would heed"; and (3) that "[t]he meaning of reasonable doubt can be arrived at by emphasizing the word reasonable." The defendant also argues that the "cumulative effect" of these instructions diluted the state's burden of proof and deprived her of a fair trial. Although the defendant acknowledges that this court repeatedly has rejected these claims in prior cases; see, e.g., *State* v. *Winfrey*, 302 Conn. 195, 218–19, 24 A.3d 1218 (2011); *State* v. *Mark R.*, 300 Conn. 590, 616–17, 17 A.3d 1 (2011); *State* v. *Bowman*, 289 Conn. 809, 811 n.2, 960 A.2d 1027 (2008), overruled in part on other grounds by *State* v. *Elson*, 311 Conn. 726, 91 A.3d 862 (2014); *State* v. *Patterson*, supra, 276 Conn. 491 n.26; she explains that she has raised them to preserve them for future federal habeas review. The state argues that the defendant waived her claims under *State* v. *Kitchens*, 299 Conn. 447, 482–83, 10 A.3d 942 (2011),[13] by failing to object to the challenged jury instructions after the trial court provided the parties with copies of its proposed instructions and afforded the parties a meaningful opportunity to review them. Alternatively, the state argues that the defendant has provided no reason why we should overrule our precedent rejecting identical claims of instructional impropriety.

It is unnecessary to decide whether the defendant waived her claim under *Kitchens* because, even if she did not, she has offered no convincing reason why we should reconsider our prior case law. "Moreover, as in those prior cases, we see no reasonable possibility that the challenged language, when read in the context of the entire charge regarding reasonable doubt, misled the jury in its understanding of the state's burden of proving the defendant's guilt beyond a reasonable doubt." *State* v. *Winfrey*, supra, 302 Conn. 219.

The judgment is affirmed.

In this opinion the other justices concurred.

[1] General Statutes § 53a-134 (a) provides in relevant part: "A person is

guilty of robbery in the first degree when, in the course of the commission of the crime of robbery as defined in section 53a-133 or of immediate flight therefrom, he or another participant in the crime . . . (4) displays or threatens the use of what he represents by his words or conduct to be a pistol, revolver, rifle, shotgun, machine gun or other firearm, except that in any prosecution under this subdivision, it is an affirmative defense that such pistol, revolver, rifle, shotgun, machine gun or other firearm was not a weapon from which a shot could be discharged. Nothing contained in this subdivision shall constitute a defense to a prosecution for, or preclude a conviction of, robbery in the second degree, robbery in the third degree or any other crime.''

[2] General Statutes § 53a-8 (a) provides: "A person, acting with the mental state required for commission of an offense, who solicits, requests, commands, importunes or intentionally aids another person to engage in conduct which constitutes an offense shall be criminally liable for such conduct and may be prosecuted and punished as if he were the principal offender.''

[3] General Statutes § 53a-48 (a) provides: "A person is guilty of conspiracy when, with intent that conduct constituting a crime be performed, he agrees with one or more persons to engage in or cause the performance of such conduct, and any one of them commits an overt at in pursuance of such conspiracy.''

[4] General Statutes § 53-202k provides: "Any person who commits any class A, B or C felony and in the commission of such felony uses, or is armed with and threatens the use of, or displays, or represents by his words or conduct that he possesses any firearm, as defined in section 53a-3, except an assault weapon, as defined in section 53-202a, shall be imprisoned for a term of five years, which shall not be suspended or reduced and shall be in addition and consecutive to any term of imprisonment imposed for conviction of such felony.''

[5] Although § 53-202k is a sentence enhancement provision and not a separate crime, and "does not expressly delegate to the jury the task of determining whether a firearm was used in the commission of a felony, we have interpreted [it] to require the jury to perform that fact-finding function." *State* v. *Patterson*, 276 Conn. 452, 477, 886 A.2d 777 (2005).

[6] The trial court sentenced the defendant to a term of imprisonment of one year on the conviction of robbery in the first degree as an accessory, a consecutive five year term of imprisonment under § 53-202k, and a term of imprisonment of six years on the conviction of conspiracy to commit robbery in the first degree. The six year term on the conspiracy count is to run concurrently with the sentences imposed for the accessory count and under § 53-202k. The six year term of imprisonment is to be followed by ten years of special parole.

[7] The defendant appealed to the Appellate Court from the judgment of the trial court, and we transferred the appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-2.

[8] Because the present case involves the actual use of a firearm, for the sake of convenience, we refer to the statutory prohibition in terms of use only.

[9] The defendant was tried with Flemke, who also was convicted of robbery in the first degree as an accessory and conspiracy to commit robbery in the first degree. See *State* v. *Flemke*, 315 Conn. 500, 504–505,      A.3d (2015). In light of the jury's finding that a firearm had been used in the commission of the robbery, the court determined that Flemke also was subject to a sentence enhancement under § 53-202k. Id., 502–503.

[10] The defendant filed motions for judgment of acquittal at the close of the state's case, at the close of evidence, and after the jury returned its verdict. Although the state notes that the defendant did not challenge the sufficiency of the evidence on the specific grounds that she raises on appeal, it concedes that, even if the defendant's claims were not properly preserved, they are nonetheless reviewable under *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989). See, e.g., *State* v. *Adams*, 225 Conn. 270, 275–76 n.3, 623 A.2d 42 (1993) (unpreserved claims of evidentiary insufficiency are reviewable on appeal).

[11] We note that the defendant does not claim that there was insufficient evidence to support a finding that Matzdorff committed the crime of robbery in the first degree, nor does she claim that there was insufficient evidence to support a finding that she "act[ed] with the mental state required for commission of an offense," as § 53a-8 (a) requires. We therefore focus our discussion on the third element of § 53a-8 (a), namely, whether there was sufficient evidence to establish that the defendant "solicit[ed], request[ed], command[ed], importune[ed] or intentionally aid[ed]" in the commission of

the offense.

[12] As we explained in *State* v. *Pond*, supra, 315 Conn. 451, and contrary to the view expressed by the concurring justice, our decision in *Pond* is fully consistent with these principles concerning the law of conspiracy and the manner in which a conspiracy may be proved.

[13] In *Kitchens*, this court concluded that, "when the trial court provides counsel with a copy of the proposed jury instructions, allows a meaningful opportunity for their review, solicits comments from counsel regarding changes or modifications and counsel affirmatively accepts the instructions proposed or given, the defendant may be deemed to have knowledge of any potential flaws therein and to have waived implicitly the constitutional right to challenge the instructions on direct appeal." *State* v. *Kitchens*, supra, 299 Conn. 482–83.